**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

v.

RYAN HOLNESS,

    *Defendant-Appellant.*

No. 11-4631

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:09-cr-00611-WMN-1)

Argued: October 4, 2012

Decided: February 11, 2013

Before KING, KEENAN, and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Keenan and Judge Thacker joined.

---

## COUNSEL

**ARGUED:** Jonathan Alan Gladstone, Annapolis, Maryland, for Appellant. John Francis Purcell, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

**OPINION**

KING, Circuit Judge:

Following a jury trial in the District of Maryland, Ryan Holness was convicted of interstate domestic violence and attempted witness intimidation. Holness appeals, contending that the district court erred by declining to suppress certain aspects of the government's evidence which, Holness alleges, were obtained in deprivation of his Sixth Amendment right to the assistance of counsel. Although the facts underlying his claim of error fail to sustain Holness's proffered Sixth Amendment theory, the record indicates a potential abridgement of his privilege against self-incrimination and concomitant right to counsel, as secured by the Fifth Amendment. Further factual development would permit a definitive resolution of the matter, but remand is unnecessary in this instance because any Fifth Amendment error was harmless beyond a reasonable doubt. We therefore affirm Holness's convictions.

I.

About ten minutes before six o'clock in the morning on June 5, 2009, dispatchers received a 911 call alerting them of a carjacking on Route 290 near Crumpton, Maryland, on the state's Eastern Shore. The caller related that a woman had possibly been stabbed in connection with the incident. Deputy Amanda Knox of the Kent County Sheriff's Office responded to the residence of John and Kim Rolfe, where she encountered Holness on the front porch. It had been raining, and Holness was wet, shoeless, and shaking, with a wadded loop of duct tape drooped around his neck. Knox asked about the woman reported stabbed, but Holness stood mute. Mr. Rolfe spoke up, informing the deputy that Holness had earlier volunteered that the woman was his wife, and that she was in a field off the road, about 500 yards south. With Maryland State Troopers Sayles and Forte, who had just arrived on the scene, Knox went to check on the woman.

Nearing their destination, the officers observed a number of items strewn across the road, including a purse, a paperback book, a tennis shoe, a woman's sandal, Holness's drivers license, his military ID, and a roll of duct tape. The woman, Serika Dunkley, lay dead in the field, having sustained eleven stab wounds and several dozen cuts, including four to her hands while defending the attack. The most serious wounds were to Dunkley's neck, critically compromising her left internal jugular vein, her trachea, and her thyroid gland.

## A.

Holness, born in Jamaica, immigrated to the United States in 2001 and enlisted in the Navy the following year. In June 2003, he entered into a marriage of convenience with Dunkley, his distant cousin, who then left Jamaica to live with Holness's mother and brother in Brooklyn, New York. Holness resided in an apartment in Lexington Park, Maryland, near his duty station at the Patuxent River Naval Air Station. On November 5, 2008, while accessing the internet with his roommate's computer, Holness used Dunkley's personal information to obtain a $500,000 insurance policy on her life. Holness named himself as the policy's beneficiary, charging the monthly premiums of $74.37 to his personal credit card.

Holness's landlord received federal tax credits from participating in a housing program, which permitted it to accord Holness a rent reduction of $200 per month so long as Dunkley's name was also on the lease. The applicable regulations, however, required Dunkley to execute the lease and any renewals in person. Dunkley's presence being required in Maryland to execute a renewal, she departed from Brooklyn with Holness in his blue Honda Accord on the evening of June 4, 2009, unaware that the trip — and her life — would come to an abrupt end in Crumpton a few hours later.

B.

1.

Deputy Knox and Trooper Forte returned to the Rolfe residence to interview Holness, who explained that he and Dunkley had been accosted and carjacked by a masked male at a rest area off the New Jersey Turnpike. Holness showed Knox a four-centimeter laceration on his left wrist, and he described the Honda to Forte. Holness was transported to a local hospital for treatment, where Dr. Deborah Davis diagnosed a non-displaced rib fracture. Dr. Davis sutured and stapled Holness's wrist laceration, recommending ibuprofen for the pain. Holness remained at the hospital until mid-morning, when two members of the Maryland State Police homicide unit, Sergeant Stephen Hall and Sergeant Michael Smith, picked him up and drove him to their barrack.

Prior to questioning him, the homicide officers informed Holness of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966). *See* J.A. 78.[1] Holness agreed to answer questions without resort to counsel, telling a far more detailed story than the one he recited to Deputy Knox. A gasoline receipt revealed, and Holness confirmed, that he and Dunkley had stopped at the Turnpike rest area around 11:15 p.m. According to Holness, the carjacker brandished a firearm, wore a ski mask, and used a voice modulator. Absent instructions to the contrary, Holness continued from the rest area south toward Lexington Park until, at about 1:30 a.m., he was directed to pull off the road onto an adjacent farm lane.

As the carjacker was binding Holness's hands with duct tape, Dunkley fled. The assailant pursued and Holness tried to follow, hearing Dunkley's alarmed protests: "He's cutting me, he's cutting me." J.A. 311. The carjacker returned, slashed

---

[1]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

Holness on the forearm, then pushed him to the ground, kicking him in the ribs. Holness said that he was ultimately knocked unconscious by a kick to the jaw. He awakened four hours later to find his ankles and wrists bound by duct tape, with a black bandana stuffed in his mouth. Upon freeing himself, Holness walked north to the Rolfe residence to seek assistance.

2.

At about 2 o'clock in the afternoon, as Sergeant Hall and Sergeant Smith were winding down the initial interview of Holness, their colleague, Corporal Colleen McCurdy, arrived at the crime scene with her bloodhound, Lojack. McCurdy took Lojack to a spot near where Dunkley's body was found and allowed him to sniff Holness's socks, which had been placed on the ground. Lojack began to track Holness's path — not north toward the Rolfe residence, but south toward the Chester River. After a bit, Lojack veered off the road diagonally across a field toward a modular home, where he jumped on the front door and then ran around to the back door before retreating down a driveway back to Route 290.

From that location, Lojack continued south until he got to the river, which he repeatedly attempted to enter. Corporal McCurdy took Lojack onto the bridge, but he kept trying to jump up on the rail, more interested in the water below. The track ended at the river, so McCurdy and Lojack retraced their steps to the point of origin. Once there, the dog crossed to the opposite side of the road and began to whine, indicating that he detected a powerful scent. McCurdy and Lojack then left.[2]

---

[2]Corporal McCurdy testified that, consistent with her regular practice, she was told nothing about the case upon her arrival other than where the body was found. This explains, perhaps, why McCurdy did not attempt to have Lojack pick up Holness's scent heading north from the crime scene, toward the Rolfe residence.

Holness returned to the crime scene shortly thereafter, accompanied by Sergeant Hall and Sergeant Smith. Holness had terminated his initial interview with the police and had requested an attorney, but subsequently reinitiated contact for the purpose of offering to physically reenact his version of what had occurred. Upon again being advised of his *Miranda* rights, *see* J.A. 83-84, Holness surveyed the scene and more or less repeated his earlier story. Holness explained that he had lost his shoe in the mud upon exiting the Honda, and that, once he regained consciousness after being attacked, he realized that he had somehow wound up on the opposite side of the road.

Holness reiterated that, upon awakening, he immediately headed north and sought assistance at the Rolfe residence, and he categorically denied having walked south toward the river and the bridge. Nevertheless, a resident of the modular home, Cassandra Lupton, told the police that someone had knocked on her front and back doors just before 3:30 a.m., when Holness was supposed to have been unconscious. Moreover, Dr. Davis found no evidence of head trauma consistent with Holness having lost consciousness. The police returned Holness to the barrack, where he again invoked his right to silence and requested counsel. *See* J.A. 84.

Additional details gleaned from the investigation persisted in rendering Holness's story suspect. At about 5:00 or 5:15 a.m., during the latter stages of Holness's purported incapacity, Erin Boulter was delivering newspapers in the immediate vicinity of the crime scene. Boulter swerved to miss an African-American man with "something silver on his wrists," J.A. 659, standing in the road near the bridge. Though a crime scene technician observed tape residue around Holness's neck, she found none around his wrists or ankles nor on his clothing, and there was no cut on Holness's long-sleeved shirt to match the laceration on his forearm. Forensic investigators did find Holness's DNA at various locations on the roll of unused duct tape, however, and, on Holness's clothing, they

discovered chips of what they suspected (but could not confirm) was Dunkley's fingernail polish.[3]

The police broadcast an interagency lookout for the Honda, and, later that evening, the vehicle was located on H Street in Washington, D.C., about an hour and twenty minutes away from Crumpton. In the car, blood was found matching the DNA profiles of Holness, Dunkley, and a third person denominated "unknown Male 1." J.A. 674-75. The mystery man's blood also turned up on Dunkley's sandal, her purse, and the paperback book. An examination of the computer in Holness's apartment revealed that, less than a week prior to the trip, someone made search engine inquiries for Apex and Greyhound websites. An Apex bus stop is located on H Street in Washington, D.C., about a block from where the Honda was recovered.

C.

1.

Holness's story failed to convince the police, which arrested and confined him on suspicion of involvement in Dunkley's killing. The grand jury for the state judicial district in Maryland indicted Holness on July 2, 2009, charging him with first- and second-degree murder. During his time in the county detention center, Holness shared a cell with Stephen McGrath, a contractor previously convicted of doing unlicensed work and jailed ninety days in mid-July for failing to fulfill his restitution obligations.

McGrath sent a letter dated August 18, 2009, to the Kent County prosecutor, in which he asserted that he had "come across some unique information regarding Ryan Holness." Gov't Exhibit No. 94-A. McGrath maintained that Holness

---

[3]Dunkley's cell phone signal registered on a tower in Crumpton at 1:23 a.m., but neither the phone nor the murder weapon has ever been found.

had told him "some interesting stuff which led me to believe he actually killed his wife." *Id.* According to McGrath, Holness recalled that he and Dunkley had argued bitterly earlier in the evening, that the couple "had stopped at a rest area," where, McGrath seemed to imply, Holness intended to physically confront Dunkley, but "something wasn't right there." *Id.* Holness thus "decided to head down to the Crumpton area," having become familiar with the route on his numerous trips to New York. *Id.* McGrath said that Holness confided that he "almost got seen by a passing car as he was popping the trunk" while the Honda was parked along Route 290, and that he mentioned "something about going to someone's house for help but eventually changed his mind." *Id.*

McGrath observed that Holness "is very much a loner and keeps to himself much as I do," speculating that "this is the reason why I believe he shared his secret with me." Gov't Exhibit No. 94-A. McGrath requested that the prosecutor let him know whether his information was helpful, offering that "[m]aybe if possible you can not object to my modification [for a reduced sentence]. Not that I'm asking to make a deal it's just I'd rather not be in here if what I've learned has helped you as I'm sure his lawyer will notify him of [this] letter." *Id.* McGrath explained that he "just wanted to set the record straight as honestly my children play in Crumpton and I think what he did was awful." *Id.* McGrath signed the letter; then, seemingly as an afterthought, he appended a postscript in which his narrative became far less vague and oblique:

> P.S. In short he killed his wife cause she found out he was cheating, and his brother helped him. Also he said his defense was planned from the beginning by parking the car in a location where the alle[ged] carjacker would have been seen on tape leaving the car. He told me that today after his Attorney obtained discovery and he found out apparently that the footage was dumped after 10 days and now his defense

is in jeopardy. It wasn't never about the life insur-
ance.

*Id.*

Sergeant Hall met with McGrath on August 31, 2009.
McGrath reiterated much of what he had set forth in the letter,
but he acknowledged that Holness had "never told him the
full story." Gov't Exhibit No. 101-D. Indeed, McGrath related
to Hall that Holness had "never made a specific admission to
murdering his wife." *Id.* The "something" that "wasn't right"
at the rest stop evidently turned out to refer to McGrath's
impression of Holness's forthrightness concerning one aspect
of the latter's account, namely, that Holness "went out of his
way to urinate" in a secluded part of the parking lot "instead
of going in the store," just before the carjacker appeared. *Id.*
McGrath did add, however, that Holness had expressed worry
over some of the physical evidence, including the blood found
in the Honda and the lack of duct tape residue on his arms.

With respect to the postscript, McGrath clarified that the
rather stark conclusions drawn therein were "strictly his inter-
pretation based on the information and statements Holness has
provided." Gov't Exhibit No. 101-D. The meeting resulted in
no agreement for a reduction of sentence, with McGrath not-
ing that "he only had 40 days left to serve and wasn't too con-
cerned about whether the judge grants [the motion for
modification] or not." *Id.* Sergeant Hall invited McGrath to
reinitiate contact if Holness volunteered additional informa-
tion, but cautioned him to not ask any direct questions.

Not long thereafter, Holness asked McGrath to help him
write a letter, which Holness planned to have delivered to the
*Washington Post* and other area newspapers. The letter, with
the anonymous (yet remorseful) carjacker as its purported
author, was designed to divert suspicion from Holness by sug-
gesting that the real culprit in Dunkley's murder was yet at
large. McGrath forwarded news of the plan to Sergeant Hall,

who, on September 15, 2009, provided McGrath with a recording device, which McGrath kept hidden in his pillow.

At first, Holness dictated the contents of the letter for McGrath to transcribe, but Holness became dissatisfied with the effort. Thereafter, Holness himself composed, then destroyed, a second draft of the letter, of which McGrath was able to retain one page and recite the remainder into the recorder. At a meeting on October 1, 2009, McGrath provided Sergeant Hall with the letter fragment and the recorder. Hall used the information to obtain a search warrant for the cell, which was executed on October 6, 2009. Among the items recovered was the intact initial draft of the letter in McGrath's handwriting.

McGrath was released from custody thirteen days early, on October 10, 2009, but only as the result of accumulated good-time credits; the prosecutor had filed an opposition to McGrath's motion for a reduced sentence, and the motion was denied. Shortly after McGrath's release, Holness was found in possession of a shank and placed in solitary confinement. On the wall of his new cell, he scrawled "Stephen Scott McGrath, rat snitch," together with McGrath's home address and phone number.

2.

At about the same time, on October 13, 2009, Sergeant Hall met with representatives of the United States Attorney's office in Baltimore to explore transferring the case for prosecution. The discussion proved fruitful, as a federal grand jury returned a single-count indictment against Holness on November 24, 2009. Six days later, on the prosecution's motion, the state court charges were dismissed. *See* J.A. 112. The operative Second Superseding Indictment, filed March 1, 2011, charged Holness with interstate domestic violence (Count One), attempted obstruction of an official proceeding

(Count Two), attempted witness intimidation (Count Three), and fraudulent misuse of a passport (Count Four).[4]

Holness moved the district court to suppress all statements he made to McGrath and any evidence obtained as a result. The court conducted a pretrial motions hearing on March 14, 2011, at the conclusion of which it denied the motion to suppress, but granted Holness's motion to sever Count Four. A jury was then empaneled, which, over the following two weeks, heard the trial evidence as set forth above.

In addition, when McGrath took the stand, the jurors heard something new. On its direct examination, the government inquired of McGrath, "Do you recall Mr. Holness ever telling you anything . . . about what happened to the murder weapon?" J.A. 508. McGrath acknowledged in the affirmative: "He just kind of said, 'Well, I threw them in the river.'" *Id.* After permitting the jury a few minutes to process that information, the government reinforced the point as McGrath was invited to explain various aspects of his August 18, 2009 letter. The government asked McGrath, "[W]hat particular secret is it that you were relating to when you said that Mr. Holness shared his secret with me?" *Id.* at 516. McGrath

---

[4]The Second Superseding Indictment alleged with regard to Count One that Holness "traveled in interstate commerce with the intent to kill and injure a spouse . . . and in the course of and as a result of such travel, committed and attempted to commit a crime of violence against that spouse," J.A. 41, in violation of 18 U.S.C. § 2261(a)(1). Count Two, stemming from the letter-writing scheme with McGrath, asserted that Holness "did corruptly attempt to obstruct, influence, and impede an official proceeding," J.A. 42, as proscribed by 18 U.S.C. § 1512(c)(2). The "outing" of McGrath via the cell graffiti resulted in Count Three, which charged that Holness "did knowingly attempt to intimidate and threaten a witness . . . with the intent to influence, delay, and prevent the testimony of S.M. in an official proceeding," J.A. 43, in contravention of 18 U.S.C. § 1512(b)(1). Count Four related to a January 2008 incident whereby Holness reported his daughter's passport lost in order to obtain a duplicate that he hoped would allow his son to enter the country from Jamaica, *see* J.A. 44, conduct alleged to have run afoul of 18 U.S.C. § 1544.

responded, "The fact that he said he threw the knives in the river, the knife in the river." *Id.*[5]

At the conclusion of trial, on March 28, 2011, the jury returned a guilty verdict on the three counts. On June 9, 2011, the district court entered judgment on the verdict, sentencing Holness to life imprisonment on Count One, with a 240-month concurrent term on Count Three. Pursuant to the government's motion, the court dismissed Count Two and Count Four. Holness appeals.

## II.

Absent clear error, we will not disturb any findings of fact made by the district court in support of its ruling on a motion to suppress. *See United States v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012). The court's legal conclusions, however, are reviewed de novo. *See id.* Where, as here, the challenged ruling entails the denial of a criminal defendant's motion to suppress, we view the evidence in the light most favorable to the government. *See id.* Though a trial error be of constitutional dimension, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that [it] was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *see Chapman v. California*, 386 U.S. 18, 24 (1967).

## III.

Holness maintains that the district court erroneously "fail-[ed] to suppress evidence which flowed from Stephen McGrath's activities after speaking with the police," that is, Sergeant Hall, on August 31, 2009. Br. of Appellant 15. McGrath, Holness contends, became an agent of the police as

---

[5]McGrath's revelation of Holness's previously undisclosed admission regarding the murder weapon appears to have initially been made before the grand jury. *See* J.A. 552.

a result of the August 31 meeting. Holness had by then retained the services of a public defender in connection with the state murder charge, and that lawyer was not present during his subsequent jail cell conversations with McGrath. These conversations, according to Holness, amounted to police interrogation in contravention of the Sixth Amendment, which assures that "[i]n all criminal prosecutions," the accused shall "have the assistance of counsel for his defense." U.S. Const. amend. VI; *see Miranda v. Arizona*, 384 U.S. 436, 465 n.35 (1966) (observing that the denial to an accused of access to his attorney, "[i]ndependent of any other constitutional proscription, . . . constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake" (citation omitted)).

A.

Holness's argument finds its genesis in *Massiah v. United States*, 377 U.S. 201 (1964), in which the Supreme Court held that the defendant "was denied the basic protections" of his Sixth Amendment right to counsel by the admission of uncounseled post-indictment statements obtained from a listening device supplied by the police to a cooperating codefendant. *Id.* at 206. These statements were the product of active interrogation, according to the Court, in that they had been "deliberately elicited" by the government. *Id.*

Some years later, we found occasion to apply *Massiah* in the prison environment. In *Henry v. United States*, 590 F.2d 544 (4th Cir. 1978), the government enlisted an inmate informant to engage the defendant, who proceeded to make incriminating statements concerning his participation in an armed robbery for which he was awaiting trial. When trial arrived, the government relied on the statements to secure a guilty verdict against the defendant. We set aside the conviction, determining that the government's actions in obtaining the statements breached the defendant's Sixth Amendment right to counsel, as set forth in *Massiah*. *See* 590 F.2d at 546-47.

The Supreme Court accepted certiorari and affirmed. *See United States v. Henry*, 447 U.S. 264 (1980).

In confirming that *Massiah* controlled, the Supreme Court eschewed the notion that the government had not deliberately elicited the statements at issue merely because it had cautioned the informant "not to question Henry about the robbery." *Henry*, 447 U.S. at 270. The Court instead considered it more significant that the informant was facilitating the government's agenda and being compensated therefor, that the resultant agency relationship had not been disclosed to the defendant, and that the defendant was susceptible to the pressures of confinement while under indictment. *See id.* at 270-74.

Here, the government strives to distinguish *Massiah* and *Henry* by attempting to persuade us that McGrath was merely a "'listening post'" stationed in Holness's cell. *See Muehleman v. Florida*, 484 U.S. 882, 885 (1987) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 456 n.19 (1986)). Consistently therewith, the government describes its star witness's conduct as strictly passive and therefore not interrogation geared toward deliberately eliciting statements such as the ones Holness sought to suppress.

Putting aside, for the time-being, the accuracy of the government's portrayal, we observe that Holness's pursuit of relief pursuant to the Sixth Amendment encounters a roadblock not confronted by the defendants in *Massiah* or *Henry*. Although those prior cases arose in the same procedural posture as Holness's, that is, they involved appeals stemming from federal prosecutions, a critical distinguishing feature here is that the actions alleged to have resulted in a constitutional violation were taken by state authorities prior to the defendant's indictment on federal charges. Had Holness proceeded to trial in state court, the Sixth Amendment issue would have been squarely presented.[6] However, the right to

---

[6]The right to counsel afforded federal defendants by the Sixth Amendment applies with equal force to state criminal proceedings by virtue of its

counsel secured by the Sixth Amendment has been deemed "offense specific," i.e., "[i]t cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).

To illustrate, in *Texas v. Cobb*, 532 U.S. 162 (2001), the defendant reported his wife and infant daughter missing in the aftermath of a supposed burglary of the family's home. The defendant eventually confessed to the burglary, for which he was indicted and given a lawyer. With his counsel present, the defendant was twice interrogated concerning the disappearances, but he denied any involvement. Later, the defendant was arrested on suspicion of murder in connection with the disappearances, given *Miranda* warnings, and, after waiving his rights, confessed to killing his family.

On state appellate review, the defendant obtained reversal of his conviction and resultant death sentence, but the Supreme Court reinstated the trial court's judgment. In so ruling, the Court concluded that the defendant's invocation of his Sixth Amendment right to counsel, while effective with respect to the initial burglary prosecution, was ineffective as to the subsequent murder proceedings because the charged offenses were different, namely, burglary and murder, each of which "'requires proof of a fact which the other does not.'" *Cobb*, 532 U.S. at 174 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

B.

1.

In the case before us, Holness seeks to attack the validity of his federal conviction for interstate domestic violence

---

incorporation through the Fourteenth Amendment. *See Gideon v. Wainwright*, 372 U.S. 335, 342-45 (1963).

based on the invocation of his Sixth Amendment right to counsel in connection with a prior state charge of murder. To convict Holness of murder in the first degree, the State of Maryland would have had to prove that he committed "a deliberate, premeditated, and willful killing." Md. Code, Crim. Law, § 2-201(a)(1). Holness's conviction on the federal charge of interstate domestic violence, on the other hand, was contingent on the government showing that he

> travel[led] in interstate or foreign commerce . . . with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and . . . in the course of or as a result of such travel, commit-[ted] or attempt[ed] to commit a crime of violence against that spouse, intimate partner, or dating part-ner.

18 U.S.C. § 2261(a)(1).

The two offenses, when juxtaposed, fail the *Blockburger* test for identity. One readily discernible difference is that a conviction for first-degree murder in Maryland requires proof of a "killing," while the victim's death is not a prerequisite for a conviction under § 2261(a)(1); conversely, interstate travel must be shown in connection with the federal offense, but no such condition adheres to the state offense. Even were the contrast not so stark, "federal and state crimes are not the same offense, no matter how identical the conduct they pro-scribe." *United States v. Alvarado*, 440 F.3d 191, 196 (4th Cir. 2006) (citations omitted); *see United States v. Coker*, 433 F.3d 39 (1st Cir. 2005).

In *Alvarado*, the defendant was arrested on state drug charges after waiving his *Miranda* rights and answering ques-tions. The state provided Alvarado with a lawyer, but then dismissed the charges following his preliminary hearing, releasing him to ATF custody in response to a federal crimi-nal narcotics complaint. After again being given *Miranda*

warnings, Alvarado, without counsel present, made incriminating statements. Applying *Cobb*, we rejected Alvarado's constitutional challenge to his conviction, concluding that "the Sixth Amendment right to counsel in the state proceedings did not survive the dismissal of state charges. [The] defendant's state and federal offenses were inherently distinct under the dual sovereignty doctrine." *See* 440 F.3d at 198.

*Coker* clearly illustrates the proper application of *Cobb* in the dual-sovereignty context. In *Coker*, the defendant was arraigned in state court and appointed a lawyer to defend him on arson and injury-to-property charges stemming from a dwelling fire ignited by a Molotov cocktail. The fire department alerted the ATF, which led to Coker being questioned by federal authorities outside the presence of counsel after receiving *Miranda* warnings and giving his consent to proceed. During the interview, Coker confessed to setting the fire, after which he was indicted by a grand jury and convicted in federal court of attempted arson. The court of appeals rejected Coker's Sixth Amendment challenge, noting that although the state and federal arson charges "both . . . involved the same essential elements of proof," *see* 433 F.3d at 42, "the dual sovereignty doctrine applies for the purposes of defining what constitutes the same offense" for right-to-counsel purposes, *id.* at 44.

2.

Holness nonetheless insists that the strictures of *Cobb* and *Alvarado* must yield to and be interpreted in light of *Elkins v. United States*, 364 U.S. 206 (1960). In *Elkins*, state law enforcement officers executed a search warrant at a suspicious residence, expecting to seize pornography. There was no pornography, but there was wiretapping paraphernalia. The state instituted criminal proceedings, but the trial court granted the defendants' motion to suppress the seized evidence on the ground that the search was unlawful. Meanwhile, federal authorities executed their own search warrant on the safety

deposit box where the state had placed the evidence. The state charges were abandoned, but, shortly thereafter, the defendants were indicted by a grand jury and convicted of federal wiretap offenses after the district court denied their suppression motion. The court of appeals affirmed the convictions, deeming irrelevant the lawfulness of the state search and seizure "because there had been no participation by federal officers." *Elkins*, 364 U.S. at 208.

The *Elkins* Court vacated and remanded, ruling that, as dictated by the Fourth Amendment's applicability to the states by virtue of its Fourteenth Amendment incorporation, "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizure . . . is inadmissible over the defendant's timely objection in a federal criminal trial." 364 U.S. at 223. The Court noted that a contrary rule "implicitly invites federal officers . . . at least tacitly to encourage state officers in the disregard of constitutionally protected freedom," providing an "inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigation." *Id.* at 221-22.

We perceive no urgency in this case prompting us to employ *Elkins* to craft an exception through which the Sixth Amendment right to counsel might apply beyond its offense-specific limitations. There is certainly no suggestion in the record before us that the state authorities engaged in any misconduct for which they might seek, through collusion with the federal government, to avoid the attendant ramifications. Moreover, as we explain in Part V, *infra*, the Fifth Amendment affords us ample opportunity to analyze and evaluate the conduct of which Holness complains, i.e., his police-prompted interaction with McGrath while detained on the authority of the State of Maryland.

It comes as no surprise, then, that at the suppression hearing, the district court dutifully applied *Cobb* and *Alvarado*,

observing that "there was no involvement of the federal government" in advance of the August 31, 2009 meeting between McGrath and Sergeant Hall. J.A. 119. The court thus arrived at the inevitable conclusion that "the Sixth Amendment right simply did not attach" to the federal charges. *Id.* Grounded in the cited precedents, the court's ruling on the discrete issue before it was quite obviously correct, but we confront uncommon circumstances here that necessitate further inquiry.

## IV.

Mindful of our role as arbiter and not advocate, we make no habit of venturing beyond the confines of the case on appeal to address arguments the parties have deemed unworthy of orderly mention or, perhaps, not contemplated at all. Our general disdain for the helter-skelter manifests itself in myriad specific ways, such as the oft-cited "rule that contentions not raised in the argument section of the opening brief are abandoned." *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004). We have implemented a similar rule with respect to arguments raised solely in amicus briefs, on the ground that such issues have "plainly been waived by the only party entitled to pursue" them. *Snyder v. Phelps*, 580 F.3d 206, 216 (4th Cir. 2009), *aff'd*, 131 S. Ct. 1207 (2011). Abandonment and waiver are therefore prominent concepts, and we strive to apply their implementing rules on a consistent basis, because they facilitate the Court's business and provide a substantial measure of fairness and certainty to the litigants who appear before us.

These "rules," however, are not jurisdictional in the sense that they encroach in any fashion upon our inherent authority to consider and decide pertinent matters that otherwise may be ignored as abandoned or waived. Thus, we possess the discretion under appropriate circumstances to disregard the parties' inattention to a particular argument or issue. *See Rice v. Rivera*, 617 F.3d 802, 808 n.4 (4th Cir. 2010) (citing *A Helping Hand, LLC v. Balt. Cnty., Md.*, 515 F.3d 356, 369 (4th

Cir. 2008)). One factor that may militate in favor of exercising that discretion exists when the facts have been sufficiently developed to readily permit evaluation of an alternative legal theory. *See New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24-25 (4th Cir. 1963) (declining on remand to construe as judicial admission counsel's prior legal stipulation disproved on appeal, as informed by modern pleading practice that "a party's misconception of the legal theory of his case does not work a forfeiture of his legal rights"), *cited in Rice*, 617 F.3d at 808 n.4.

Other factors include enhancing the efficiency of the decisionmaking process and the conservation of scarce judicial resources. *See LaBruna v. U.S. Marshal*, 665 F.2d 439, 442 (2d Cir. 1981) (deviating from "customary rule" to consider argument not presented to district court insofar as appellate ruling would "promote interest of judicial economy since the record is already adequate to permit a determination," and remand "would further postpone the ultimate resolution of" the petitioner's underlying claim for relief). The court of appeals in *United States v. Giovannetti*, 928 F.2d 225 (7th Cir. 1991), recognized that it could, on its own accord and notwithstanding the government's failure to raise the issue, assess the harmlessness of an error in a criminal trial. To determine whether it should exercise such discretion, the Seventh Circuit identified "the controlling considerations" as the size of the record and its complexity, the degree to which the court could be certain of its resultant legal analysis, and whether avoiding the issue would "result in protracted, costly, and ultimately futile proceedings in the district court." *Id.* at 227.

In Holness's case, we discern the need to evaluate the merits of the constitutional implications of his interactions with McGrath following the latter's meeting with Sergeant Hall. We have already concluded that no acts imputable to the State of Maryland worked any deprivation of Holness's Sixth Amendment right to counsel with respect to the federal

charges of which he stands convicted. A substantial question remains, however, as to whether those same acts contravened Holness's Fifth Amendment rights. We think the issue fairly arises from the face of the record, and that it may be definitively resolved thereon. That record, though voluminous, has not been rendered inscrutable by its length. Evaluating on direct appeal the application of the Fifth Amendment is likely to promote judicial economy, insofar as our disposition now will conserve the time and effort that would otherwise be expended in the inevitable habeas corpus proceeding to develop a claim that counsel was ineffective for neglecting to bring the matter to our attention.

V.

A.

1.

The Fifth Amendment provides, among other things, that no one "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This "privilege against self-incrimination," *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), is safeguarded in part by the familiar prophylactic warnings given to arrestees that, for example, they have the right to remain silent and the right to the presence of an attorney — the latter at public expense, if necessary, *see id.* at 479. Thus, although the text of the Amendment does not specifically confer any entitlement to legal representation in criminal cases, the Supreme Court, through its implementing decisions, has "declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

Though deriving from the privilege against self-incrimination, the Fifth Amendment right to counsel is discrete therefrom, as signified by the means the police must

employ in response to the invocation of either. *See Edwards*, 451 U.S. at 482 ("If the accused indicates that he wishes to remain silent, the interrogation must cease. If he requests counsel, the interrogation must cease until an attorney is present."). The right to counsel embodied in the Fifth Amendment is likewise distinct from its Sixth Amendment counterpart. Whereas the Sixth Amendment entitlement attaches only in "criminal prosecutions," i.e., upon indictment or other commencement of formal proceedings, the Fifth Amendment right may arise beforehand, whenever a suspect is taken into custody and questioned.

The interplay is perhaps best illustrated in *McNeil v. Wisconsin*, 501 U.S. 171 (1991). The suspect in that case, upon arrest for an armed robbery during a burglary near Milwaukee, refused to answer any questions but failed to request an attorney; he was nonetheless assigned a public defender at his initial appearance. Remaining in custody through the following week, the suspect was thrice questioned concerning different offenses (an armed robbery and murder in Racine County), and he waived his *Miranda* rights on all three occasions. Based in part on his statements, the suspect was formally charged with the Racine crimes.

The Supreme Court determined that the suspect having availed himself of his Sixth Amendment right to counsel in connection with the Milwaukee robbery charge did not render his subsequent uncounseled statements concerning the Racine offenses "the invalid product of impermissible approaches" by the police. *McNeil*, 501 U.S. at 177. Justice Scalia, writing for the Court, explained:

> The purpose of the Sixth Amendment counsel guarantee . . . is to protect the unaided layman at critical confrontations with his expert adversary, the government, *after* the adverse positions of government and defendant have solidified with respect to a particular alleged crime. The purpose of the *Miranda-Edwards*

guarantee, on the other hand . . . is to protect a quite different interest: the suspect's desire to deal with the police only through counsel.

*Id.* at 177-78 (citations, internal quotation marks, and alterations omitted). The Fifth Amendment right to counsel applies in a narrow sense "only to custodial interrogation," but it broadly "relates to interrogation regarding *any* suspected crime and attaches whether or not the adversarial relationship produced by a pending prosecution has yet arisen." *Id.* at 178 (internal quotation marks omitted). Thus, although the Sixth Amendment right to counsel is offense-specific, the similar right derived from the Fifth Amendment is not. *See id.* at 177.[7]

### 2.

The threshold question, then, is whether Holness had invoked, and not waived, his entitlements under the Fifth Amendment — either his right to counsel or his privilege against self-incrimination — at the time he made his incriminating statements in McGrath's presence. Holness had earlier waived both rights, first at his initial interview and then again that same day upon reinitiating contact with Sergeant Hall and Sergeant Smith for the purpose of returning to the crime scene to reenact his version of events. *See Edwards*, 451 U.S. at 484-85 (explaining that, upon accused's invocation of Fifth Amendment right to an attorney, uncounseled interrogation must cease "unless the accused himself initiates further communication, exchanges, or conversations with the police"). At

---

[7]It follows that "[t]o invoke the Sixth Amendment interest is, as a matter of *fact*, *not* to invoke the *Miranda-Edwards* interest. One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution." *McNeil*, 501 U.S. at 178. Justice Scalia concluded, "To find that the defendant invoked his Fifth Amendment right to counsel on the present charges merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard the ordinary meaning of that request." *Id.* at 178-79 (citations, internal quotation marks, and alterations omitted).

the hearing on the suppression motion, however, it was established that once Holness realized that the police would not be persuaded of his innocence, he reasserted his Fifth Amendment protections:

> [SERGEANT HALL]: I readvised him [of his *Miranda* rights] before the reenactment.
>
> [DEFENSE COUNSEL]: Before the reenactment?
>
> A: Yes.
>
> Q: When you returned to the Centerville barracks, . . . was there another advisement of rights at that point?
>
> A: No.
>
> Q: And then that interview lasted a while longer and then eventually Mr. Holness again requested —
>
> A: Yes.
>
> Q: — counsel?
>
> A: Yes. He asked for an attorney, yes.
>
> * * *
>
> Q: Okay. And it's your testimony that he stopped, I mean you stopped the interview immediately upon him asking for an attorney?
>
> A: The second time, yes.

J.A. 83-84, 86.[8]

---

[8]An assistant public defender entered his appearance on behalf of Holness in the Kent County District Court on June 15, 2009. *See* J.A. 105.

Holness's request for counsel was ultimately honored, and he was never again questioned by the police prior to being indicted in July 2009 by the State of Maryland, or, thereafter, up to the time that McGrath returned to their shared cell upon meeting with Sergeant Hall in August 2009, or, following McGrath's release, before the dismissal of the state charges upon return of the federal indictment in November 2009. After his initial appearance before the district court, Holness was in short order provided with an attorney under the Criminal Justice Act, *see* J.A. 4, and there is no indication that he was ever interviewed by the federal authorities.

Holness's deliberate invocation of his Fifth Amendment rights distinguishes his situation from that of the defendant in *Illinois v. Perkins*, 496 U.S. 292 (1990). In *Perkins*, the police, upon receiving a tip that a prison inmate awaiting trial on an unrelated charge had committed an unsolved murder, placed an undercover officer in the inmate's cellblock. The inmate was charged with the murder after he confided his involvement to the officer. The statements, however, were suppressed by the trial court, and that ruling was upheld on initial challenge, with the state court of appeals concluding that *Miranda* "prohibits all undercover contacts with incarcerated suspects that are reasonably likely to elicit an incriminating response." *Perkins*, 496 U.S. at 295 (citation and internal quotation marks omitted).

The Supreme Court disagreed and reversed, observing that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." *Perkins*, 496 U.S. at 296. The Court continued: "The essential ingredients of a police-dominated atmosphere and compulsion are not present when an incarcerated person speaks freely to someone

---

The same attorney continued to represent Holness in the Kent County Circuit Court after the state indictment and until the state charges were dismissed. *Id.* at 105, 112.

whom he believes to be a fellow inmate." *Id.* (citations and internal quotation marks omitted). The Fifth Amendment privilege against self-incrimination, the Court recalled, is triggered by custodial interrogation, but the "custody in a technical sense" to which prisoners are routinely subjected, *see id.* at 297, is not the coercive custody contemplated by *Miranda*. *See Perkins*, 496 U.S. at 296-97; *see also Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (explaining that "custody," in the *Miranda* context, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion"); *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009) (emphasizing that "[i]f the defendant is not in custody then" *Miranda* and *Edwards* "do not apply").

In effect, then, it was irrelevant in *Perkins* that the incriminating statements were made in prison, as the same result would have obtained had the suspect's dialogue with the undercover officer taken place at the local tavern. In neither case would the police have been operating under the encumbrance of a preexisting invocation of the suspect's Fifth Amendment rights. Justice Brennan, writing separately in *Perkins*, acknowledged as much:

> Nothing in the Court's opinion suggests that, had respondent previously invoked his Fifth Amendment right to counsel or right to silence, his statements would be admissible. If respondent had invoked either right, the inquiry would focus on whether he subsequently waived the particular right.

496 U.S. at 300 n.* (Brennan, J., concurring in the judgment) (citations omitted). Justice Brennan surmised, without contradiction from the majority, that "[s]ince respondent was in custody on an unrelated charge when he was questioned, he may be able to challenge the admission of these statements if he previously had invoked his *Miranda* rights with respect to that charge." *Id.* (citation omitted).

Justice Brennan's observation makes sense generally, on the one hand, given the Supreme Court's pronouncement in *Arizona v. Roberson*, 486 U.S. 675 (1988), that the Fifth Amendment entitlement to counsel applies not only to the offense with respect to which it is first invoked, but also to circumstances "in which the police want to interrogate a suspect about an offense that is unrelated to the subject of their initial interrogation." *Id.* at 677. In *Roberson*, the suspect was arrested for burglary, and, upon being advised of his *Miranda* rights by the arresting officer, requested a lawyer. Three days later, another officer arrived at the jail to question the suspect concerning a different burglary. Although the second officer again administered *Miranda* warnings, the incriminating statements obtained as the result of the interrogation were adjudged properly suppressed in light of the *Edwards* rule that, absent initiation of contact by the suspect, questioning could only have recommenced after counsel had been provided. *See Roberson*, 486 U.S. at 683 ("[T]he presumption raised by a suspect's request for counsel — that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance — does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation.").

On the other hand, it is difficult to square Justice Brennan's ruminations with the particular facts before the Court in *Perkins*, being mindful of the majority's focus on custody (or lack thereof) as the determinative factor. Regardless of whether the inmate had previously invoked his Fifth Amendment right to counsel, he simply was not in custody in the same sense as the suspect in *Roberson*, whom, though also residing in jail, had been isolated by the police for questioning.

3.

Seeking elucidation, we look to the Supreme Court's recent decision in *Maryland v. Shatzer*, 559 U.S. 98, 130 S. Ct. 1213

(2010). In *Shatzer*, the suspect was serving a sentence for sexual abuse, and the police attempted to question him twice — two and a half years apart — in the course of investigating a different abuse allegation. The suspect was segregated in a room away from the general prison population on both occasions. On the first attempt, in 2003, the suspect refused to speak without his attorney present; on the second, in 2006, the suspect waived his right to counsel and made statements implicating himself. As a result of the interrogation, the suspect was charged with sexual abuse and convicted at a bench trial after the trial judge denied suppression of the incriminatory statements.

The Supreme Court deemed that ruling correct, concluding that the *Edwards* rule is not of infinite duration, but may be disregarded "when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects." *Shatzer*, 130 S. Ct. at 1222. The Court chose to set that "sufficient duration" at fourteen days, a period affording "plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.* at 1223. The Court clarified, however, that imposition of the two-week dissipation period is not an engraved invitation for the authorities to pepper incarcerated suspects with repeated runs at uncounseled interrogation: "[W]e are not talking about 'reinterrogating' the suspect; we are talking about *asking his permission* to be interrogated." *Id.* at 1225.

*Shatzer*, then, and *Roberson* before it, are most instructive concerning overt attempts at questioning suspects at jail, while *Perkins*, in light of its facts, is probably more informative with respect to clandestine, covert attempts. In both situations, however, the presence or absence of custodial interrogation is the key — as it always has been — in determining whether, with respect to questioning conducted outside the presence of counsel, the *Edwards* rule demands the

fruits thereof be suppressed. In *Perkins*, the suspect was never in coercive custody, while in *Shatzer*, the requisite coercive aspect had long dissipated, rendering valid the suspect's Fifth Amendment waiver. The *Roberson* interrogation, by contrast, occurred well within the two-week custody barrier established in *Shatzer*.

4.

Sergeant Hall, it goes without saying, never asked permission to station McGrath in Holness's cell for the purpose of recording any inculpatory statements regarding the death of Serika Dunkley. The arrangement between Hall and McGrath was instead a covert attempt to elicit incriminating information from Holness, meaning that we should look primarily to *Perkins* for guidance. In consideration of the views expressed by Justice Brennan in his separate opinion — left unchallenged by the majority — we are unprepared to say that the Supreme Court in *Perkins* held for all time that suspects in prison can under no circumstances be in coercive custody in the presence of an unknown police agent. We are particularly reluctant to so conclude in a case where, as here, the authorities are fully aware that the suspect has invoked his Fifth Amendment rights.

To be sure, a suspect in Holness's shoes faces formidable obstacles to establishing the requisite "police-dominated atmosphere." *Perkins*, 496 U.S. at 296. The existing record would support a conclusion that McGrath became an agent of the police as a result of his August 31, 2009 meeting with Sergeant Hall. The record does not disclose, however, precisely how long each day Holness was compelled to remain in McGrath's company throughout the critical month following. We might assume that Holness and McGrath were apart at least some of the time — perhaps for meals, showers, exercise, and the like — though it seems clear that the relationship between the two was considerably closer than that between the suspect and government agent in *Perkins*. Although the

latter was referred to by the *Perkins* Court as the "cellmate" of the former, 496 U.S. at 298, the agent was in fact stationed only in the same cellblock as the suspect. *See id.* at 294.

Further, in light of McGrath's observation as expressed in his letter to Sergeant Hall that Holness "is very much a loner," it could reasonably be inferred that Holness may have relied on McGrath almost exclusively for basic human contact. It is not inconceivable that further development of the record might reveal that the personal dynamic between Holness and McGrath "generate[d] 'inherently compelling pressures which work[ed] to undermine [Holness's] will to resist and to compel him to speak where he would not otherwise do so freely.'" *Perkins*, 496 U.S. at 296 (quoting *Miranda*, 384 U.S. at 467).

The question of whether McGrath's conversations with Holness constituted interrogation could also be resolved on remand. The district court touched upon the matter briefly at the suppression hearing, but the court's comments could hardly be construed as findings. The court mused:

> [F]rom the evidence that I heard from Sergeant Hall's testimony and the recording of what we heard in terms of what he, in fact, told Mr. McGrath, although he may not have told him to be a listening post, he made it clear to him that he could not be a[n] interrogator. *So that from Sergeant Hall's perspective* there was no violation that would attach to the government.

J.A. 120 (emphasis added). The court at that point had not heard from McGrath, who testified at trial that he "listened to [Holness a] majority of the time. I mean, unless he asked me, something required me to ask him a question, then I never asked him a question." *Id.* at 582-83.

Remand to develop the material facts relating to custody and interrogation, however, is unnecessary. We will presume,

for purposes of our analysis, that any statements or acts attributable to Holness after McGrath's meeting with Sergeant Hall on August 31, 2009, were obtained in contravention of the Fifth Amendment. As explained below, we nevertheless conclude that any Fifth Amendment error was, under the circumstances of this case, harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967).

## B.

### 1.

In order for the *Chapman* harmless-error standard to be satisfied, we need be convinced that the constitutional error "'did not contribute'" to Holness's conviction. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Chapman*, 386 U.S. at 26). To put it another way, we must "be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Abu Ali*, 528 F.3d 210, 256 (4th Cir. 2008) (citation and internal quotation marks omitted). It is therefore not enough that Holness's jury could have found him guilty absent the supposed constitutional violation, for "[s]uch an analysis improperly conflates sufficiency-of-the-evidence review with the appropriate *Chapman* standard." *Virgin Islands v. Martinez*, 620 F.3d 321, 338 (3d Cir. 2010).

Nonetheless, the relative prominence and effect of the presumed Fifth Amendment error cannot be assessed in isolation, without an examination of the totality of the evidence before the jury. We begin by acknowledging that the government's case was predominantly circumstantial. The third person in the Honda that evening, i.e., "unknown Male 1," was not apprehended or identified; consequently, there were no witnesses who directly testified to Holness's involvement. The murder weapon was not recovered. Absent a signed confession from Holness, a guilty verdict depended in significant

part on the jury disbelieving his version of events as demonstrably inconsistent with some of the physical evidence. In counterpoint — and of considerable importance here — the government was not required to prove that Holness actually killed Dunkley, but only that he aided or abetted his alleged accomplice, or procured the commission of the murder. *See* 18 U.S.C. § 2(a).

2.

Assuming, for the sake of argument, that all evidence of any interaction between Holness and McGrath subsequent to the latter's meeting with Sergeant Hall should have been excluded, that ruling would have pertained in relevant part to the discussion and efforts concerning the proposed letter to the *Washington Post*, McGrath's aborted draft, the recovered remains of Holness's draft, and McGrath's recording of the remainder. By introducing this evidence of desperate measures on the part of Holness, the government obviously intended for the jury to infer that his desperation was motivated by having actually caused Dunkley's death. The desired inference was far from being compelled, however, in that Holness's actions plausibly could also have been those of an innocent man who, realizing that juries are not infallible, was preoccupied with the practical possibility that he was going to be imprisoned for the rest of his life for a crime he did not commit. The defense did not so portray the challenged evidence, but the competing inferences are apparent enough to have hardly escaped the jury's notice.[9]

---

[9]We would be remiss if we neglected to point out that, in arguing for a judgment of acquittal on the obstruction count at the close of all the evidence, defense counsel characterized Holness's draft as "the document that has become the centerpiece of this trial." Transcript of Proceedings, March 25, 2011, at 7. We have independently reviewed the record, and though we have nothing but the utmost respect for the viewpoints and observations of the tireless advocates tasked with preserving the liberty of those accused of crimes (and who are actually present to observe the events in question), we think it unwise to uncritically credit the apparent spontaneous hyperbole of counsel, begat in the heat of battle.

Exclusion of the letter scheme would not have required the trial court to also bar evidence of Holness having subsequently decorated the wall of his cell with graffiti labeling McGrath a "snitch," and McGrath would certainly have been permitted to offer his testimony concerning anything he observed prior to contacting Sergeant Hall. The majority of those observations were detailed in McGrath's letter, kernels of fact among the chaff of opinion. These include the revelations that: (1) Holness and Dunkley were fighting to the extent that Dunkley mentioned the possibility of divorce; (2) it was Holness's decision (and not the carjacker's) to drive to Crumpton; (3) Holness was almost seen, and by implication did not wish to be, as the Honda was pulled to the side of Route 290 with its trunk open; (4) Holness changed his mind about going to someone's house for help; and (5) Holness conspired with the carjacker to dispose of the Honda in a manner that would deflect suspicion from himself.

Moreover, the physical evidence consistently indicated that Holness did not tell the truth to the police. Dr. Davis diagnosed no injury that would have supported Holness's contention that he lost consciousness, an assertion likewise belied by Lojack's tracking path and the corroborating testimony of Lupton and Boulter. Holness maintained that he had been bound by duct tape, yet his clothing bore no tape residue. The wound on Holness's arm was superficial, no matching rend or tear was revealed on his clothing, and his DNA was found on the tape roll, all of which suggests that Holness used the duct tape and the unrecovered blade on himself. Finally, that the Honda was recovered near an Apex bus stop, correlating to an internet search made shortly before on a computer to which Holness had unfettered access, is simply too tantalizing a happenstance to discount.

### 3.

Most damning of all, however, was McGrath's revelation at trial that Holness admitted to having thrown in the river the

weapon or weapons used to murder Serika Dunkley. As McGrath clarified through his testimony, this "secret," alluded to in his August 31, 2009 letter to Sergeant Hall, was disclosed to him by Holness prior thereto. Inasmuch as there was no evidence of McGrath having received anything of value in exchange for implicating Holness, the jury was entitled to accord his testimony significant weight unless there was some justification for discrediting it. Holness's admission, if credited, was far more directly probative of his guilt than his belated attempt to engineer an ambiguously motivated clumsy scheme to deflect the investigators' suspicions.[10]

Beyond the potential risk of taint presented by portions of McGrath's testimony, the evidence of Holness's guilt went far beyond mere sufficiency. Given the entirety of the circumstances, we are satisfied to say that the district court's judgment, entered on the jury's guilty verdict, could not have been substantially swayed by the evidence that may have been admitted in violation of the Fifth Amendment. That being the case, we are convinced that any constitutional error in Holness's trial did not contribute to his convictions and was therefore harmless.

---

[10]Defense counsel, perhaps out of tactical concerns of overemphasis, did not cross-examine McGrath on the murder weapon bombshell and why he failed to specifically mention such an important point in his letter to Sergeant Hall, or even in the follow-up interview. Instead, counsel tried to suggest that McGrath learned everything he knew about the case from discovery materials provided to Holness in his cell, and from the publicly available Statement of Charges filed in the state murder proceeding. On redirect, the prosecutor returned to the issue of the knife and McGrath's testimony that Holness had thrown it in the river, asking: "[Y]ou didn't get that out of the Statement of Charges, did you?" J.A. 600. After McGrath answered in the negative over Holness's objection, the prosecutor followed up: "Where did you get that?" *Id.* McGrath responded, "From Mr. Holness." *Id.* at 601.

## VI.

Pursuant to the foregoing, the judgment of the district court is affirmed.

*AFFIRMED*