ON REHEARING

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4370**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALEJANDRO GARCIA-LAGUNAS, a/k/a Alex Fuentes,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, Senior District Judge. (5:12-cr-00376-F-1)

Argued: September 17, 2015          Decided: September 1, 2016

Before DUNCAN and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Diaz wrote the opinion, in which Judge Duncan joined. Senior Judge Davis wrote a dissenting opinion.

**ARGUED**: Paul K. Sun, Jr., ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Kelly Margolis Dagger, ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States

Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

DIAZ, Circuit Judge:

A jury convicted Alejandro "Alex" Garcia-Lagunas of conspiracy to distribute or possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), 846. He was sentenced to 188 months' imprisonment. Garcia-Lagunas appealed and we affirmed his conviction, finding that the government committed nonconstitutional error by using ethnically charged evidence to rebut Garcia-Lagunas's assertion that he was too poor to have dealt in large quantities of drugs, but that such error was harmless. We also vacated his sentence, holding that the district court's miscalculation of Garcia-Lagunas's Guidelines range was plain error affecting his substantial rights, and remanded for resentencing.

Garcia-Lagunas filed a petition for rehearing and rehearing en banc. We granted Garcia-Lagunas's petition for panel rehearing, thus vacating our prior opinion and mooting the petition for rehearing en banc. We directed briefing on whether the evidentiary error, if assumed to be of constitutional magnitude, was nonetheless harmless beyond a reasonable doubt. We now again affirm Garcia-Lagunas's conviction, vacate his sentence, and remand for resentencing.

On March 27, 2012, Ronnie Reed was arrested in Fayetteville, North Carolina, on federal drug trafficking charges. Reed told the arresting officers that he had a "Mexican drug supplier" named "Alex" and led them to three trailers in Robeson County—at 33 Sonoma, 47 Sonoma, and 294 Maple Leaf—where he said he had purchased drugs from "Alex." Reed also gave the officers four telephone numbers that he had previously used to contact "Alex."

The next day, the police executed search warrants on the three trailers. They found Garcia-Lagunas's parents at 33 Sonoma and ten one-kilogram wrappers, several with "white powdery residue" on them, buried in a lean-to shed behind the trailer at 47 Sonoma. J.A. 98. At 294 Maple Leaf, officers found an older male with a small user amount of cocaine. During earlier surveillance, officers had seen a car leave 294 Maple Leaf and go to a trailer at 353 Westcott. As the search of the three trailers had not turned up "Alex," the officers decided to try 353 Westcott. When they arrived, Detective Kurt Stein observed Marco Hernandez exit the trailer from the back, and Detective Pedro Orellano and Sergeant Gregory Johnson approached him. Orellano confirmed with Hernandez that Hernandez lived at the trailer and obtained his consent to search it.

4

The officers found Garcia-Lagunas and Brian Jacobs inside the trailer. Garcia-Lagunas had white powder under his nose and appeared impaired. Garcia-Lagunas identified himself to the officers as Alex. Both Garcia-Lagunas and Jacobs told the officers that they did not live in the trailer. After Sergeant Johnson asked him to empty his pockets, Garcia-Lagunas produced $600 cash and a cell phone, which had his photograph as its background image. When Detective Stein dialed one of the phone numbers Reed had given the police for "Alex,"[1] Garcia-Lagunas's phone rang.

The officers then searched the trailer. In the kitchen, they found a handgun and several small baggies. In one bedroom, the officers found body armor; a large digital scale; a small digital scale; a black plastic bag containing a vacuum-sealed bag, which in turn contained about 800 grams of a white powdery substance; and a small baggie of crack cocaine. The white powder field-tested positive for cocaine, but later State Bureau of Investigation ("SBI") laboratory tests revealed that the powder contained no controlled substance.

Analysis of Garcia-Lagunas's phone's records connected it to several known drug dealers, including Reed, Jacobs, Thomas

---

[1] Brian Jacobs and Thomas Brewington, a drug dealer who purchased cocaine from Garcia-Lagunas, also gave officers that same phone number for "Alex."

5

Brewington, Shaun Beard, and Reginald Clark. The records showed that from February 9th to 23rd, 2012, there were 185 calls between Garcia-Lagunas and Beard; 60 between Garcia-Lagunas and Clark; 56 between Garcia-Lagunas and Jacobs; 56 between Garcia-Lagunas and Reed; and 160 between Garcia-Lagunas and various numbers with a 404 area code, which the government identified as Atlanta, a "drug hub city." J.A. 139. From February 13th to 21st, 2012, there were 37 calls between Garcia-Lagunas and the landline at 294 Maple Leaf. From February 22nd to February 23rd, 2012, there were five calls between Garcia-Lagunas and Brewington.

## B.

A grand jury charged Garcia-Lagunas[2] with conspiring to distribute or possess with the intent to distribute 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a), 846, and unlawfully reentering the United States after having previously been deported, in violation of 8 U.S.C. § 1326(a). He pleaded guilty to the unlawful reentry charge and proceeded to trial on the conspiracy charge.

Before trial, the government gave notice of its intention to call Detective Shawn Collins as an expert witness, stating that he would "testify about drug trafficking investigations and

---

[2] Garcia-Lagunas was indicted under the name Alex Fuentes.

6

methods utilized by drug traffickers to operate and protect their drug business." J.A. 32. Separately, the district court agreed to provide Garcia-Lagunas with a Spanish interpreter for the proceedings.

Collins was the government's first witness, testifying both as an expert and as a fact witness with respect to the investigation and the searches. According to Collins, the white powder found in the trailer could have field-tested positive for cocaine and still have been found to contain no controlled substance in SBI's laboratory analysis if the cocaine had been mixed with a sufficient amount of cutting agent such that "when the lab sampled a small amount of that 800 grams of cocaine there . . . wasn't enough cocaine in it to even register with the SBI or the instruments they were using." J.A. 111.

Collins also told the jury that Garcia-Lagunas was "an alien illegally in the United States." J.A. 150. After the prosecution asked Collins if he saw that Garcia-Lagunas was being assisted by an interpreter in court, Collins responded that his informants had not indicated that they had needed to use Spanish in their dealings with Garcia-Lagunas. Moreover, Collins testified that Garcia-Lagunas "appeared to be fluent in English." J.A. 151.

Four drug dealers—Reed, Jacobs, Brewington, and Antonio Locklear—each testified pursuant to plea agreements to having

7

purchased cocaine from Garcia-Lagunas. Reed bought four to nine ounces of cocaine from Garcia-Lagunas at the 47 Sonoma location two times a week from October 2011 until Reed's March 27, 2012 arrest, adding up to at least six kilograms, and separately bought nine to twenty ounces of cocaine from Garcia-Lagunas at the Maple Leaf location at least once a week from December 2011 until March 27, 2012, adding up to at least four additional kilograms. Reed resold the drugs that he bought from Garcia-Lagunas, and did not use them himself.

Jacobs had been buying drugs from Garcia-Lagunas for about eight years, prior to which Jacobs had sold to Garcia-Lagunas. On the day of Garcia-Lagunas's arrest, Jacobs had given $600 to Garcia-Lagunas for three-quarters of an ounce of cocaine. Jacobs also testified that he had on over thirteen other occasions bought from a quarter of an ounce to three-quarters of an ounce of cocaine from Garcia-Lagunas.

According to Brewington, he bought cocaine from Garcia-Lagunas only once, at 294 Maple Leaf, and he bought nine ounces on that occasion. He discussed the amount of cocaine he could resell with Garcia-Lagunas, in order to negotiate a better price. Brewington noted that when he tried to redistribute the cocaine, "one of [his] people that [he] gave it to was complaining that it wouldn't" cook properly. J.A. 363.

Locklear began using Garcia-Lagunas as a source for drugs around June of 2010. From then until March 2011, he bought cocaine from Garcia-Lagunas about every other day, and he purchased the drugs to resell them. On direct examination, Locklear testified that he always bought at least nine ounces, and never more than eighteen ounces, and estimated that he had bought 29-30 kilograms total. However, on cross-examination, Garcia-Lagunas impeached Locklear with a March 2011 statement to law enforcement, in which he had apparently attributed only three kilograms of cocaine to Garcia-Lagunas.

Reed, Jacobs, Brewington, and Locklear each testified that they did not know the others, except that Reed knew of Brewington, and all testified to having spoken English with Garcia-Lagunas.

Hernandez, the owner of the trailer at 353 Westcott, testified, also pursuant to a plea agreement, that Garcia-Lagunas had been staying in the room in which the body armor and scales had been found for about four weeks leading up to the arrest, and that the armor and large scale belonged to Garcia-Lagunas.[3] Hernandez also testified that while he had never seen Garcia-Lagunas selling drugs, he had seen visitors, including

---

[3] In their testimony, Detectives Collins and Orellano noted that the room Hernandez attributed to Garcia-Lagunas looked as if it had recently been moved into.

9

Jacobs, give Garcia-Lagunas money. He also saw Jacobs give Garcia-Lagunas the gun that was found in the trailer.[4]

Detective Orellano testified about his participation in the searches and the evidence that he and Detective Stein found in the 353 Westcott trailer. While cross-examining Orellano, the defense elicited testimony regarding the squalid state of Garcia-Lagunas's living conditions, which supported Garcia-Lagunas's defense theory that he was a drug user but not a drug dealer. On redirect, Orellano told the jury that he had extensive experience investigating "Hispanic drug traffickers," and that "they're very modest living" because "they send the majority if not all of the proceeds back to their native countries." J.A. 270.

Defense counsel objected. Asked to explain the relevance of Orellano's testimony, the government said that it rebutted the defense's implied argument "that it would be impossible for the defendant to have dealt these large amounts of cocaine and taken in this large amount of money because he's living in relatively low level conditions." J.A. 271. Defense counsel responded that Orellano had not been qualified as an expert.

---

[4] When Garcia-Lagunas and Hernandez were placed in a cell together after their arrests, Garcia-Lagunas called Hernandez a "chiva," a "term supposedly . . . for the people who collaborate with the law." J.A. 305-06.

After confirming that Orellano's testimony was based on his training and experience, the district court overruled the objection.[5] Orellano repeated the testimony in slightly different terms: "It is consistent with Hispanic drug traffickers not to misuse the drug proceeds and to send or get rid of the proceeds, send them to their native countries or their next step over them in the drug trafficking organization." J.A. 274. The government referred to this testimony during its closing argument to explain Garcia-Lagunas's lack of an "extravagant lifestyle." J.A. 520.

Several other officers testified for the government. Relevant to this appeal, Detective Matthew Taylor testified that based on his training and experience, the type of baggies he found in the kitchen at 353 Westcott were "mostly used for the repackaging and sale of narcotics." J.A. 411. Detective Stein testified, based on his training and experience, that the vacuum-sealed bag containing the 800 grams of white powder was of the type frequently used by drug traffickers "to seal in the

---

[5] After defense counsel renewed his objection, the court at a bench conference stated: "I'm not quite sure what the relevance of all of this is, but I do know, based on my experience, that most Latins send money home whether they're drug dealers or not." J.A. 273. Garcia-Lagunas contends that the court's statement emboldened the government to engage in ethnic stereotyping. The court's comment is puzzling at best, but we do not address it further because there is no evidence that the jury heard it.

11

odor of the narcotics so that they're harder to be detected [and] easier to transport." J.A. 437-38.

Through cross-examination and closing argument, Garcia-Lagunas presented two defense theories: first, that even if he sold drugs to the dealer witnesses, he did so in a simple "buyer-seller" relationship, and the evidence was insufficient to show that he was involved in a distribution conspiracy with those dealers;[6] second, that he was too poor to have dealt in the large quantities that the government's witnesses attributed to him.

The court chose (without objection from the parties) not to submit a special verdict sheet for the jury to indicate the amount of cocaine Garcia-Lagunas was responsible for within the conspiracy, finding it sufficient that the verdict form specifically referenced the indictment. The jury found Garcia-Lagunas guilty of conspiring to distribute or possess with intent to distribute 500 grams or more of cocaine. After the verdict, the district court sua sponte directed the parties to brief whether it erred by failing to instruct the jury to find the amount of cocaine individually attributable to Garcia-Lagunas, as required by United States v. Collins, 415 F.3d 304

---

[6] "A mere buyer-seller relationship is insufficient to support a conspiracy conviction." United States v. Howard, 773 F.3d 519, 525 (4th Cir. 2014).

12

(4th Cir. 2005). However, it ultimately ruled that no Collins error had occurred.

The presentence investigation report (the "PSR") found Garcia-Lagunas responsible for 39 kilograms of cocaine and 16 grams of crack cocaine, resulting in a base offense level of 34. The PSR added three two-level enhancements for possession of a dangerous weapon, threatening or directing the use of violence, and obstruction of justice, resulting in a total offense level of 40. The PSR also found Garcia-Lagunas had a criminal history score of zero, putting him in criminal history category I. Garcia-Lagunas objected to the drug weight calculation and the three enhancements.

The district court overruled Garcia-Lagunas's objections to the drug weight calculation and the dangerous weapon enhancement, but sustained the objections to the other two enhancements, resulting in an offense level of 36. An offense level of 36 coupled with criminal history category I yielded a Guidelines range of 188 to 235 months' imprisonment. The government stated, however, that it would agree to a "two level downward variance based upon the Attorney General's recent directive that is related to the proposed amendment to the Guidelines, specifically the drug quantity base offense levels in the Guideline that may end up being a two level drop for each drug quantity," provided that Garcia-Lagunas agreed not to later

13

seek a variance for the same reason. J.A. 678-79. Garcia-Lagunas so agreed, and the district court stated its intent "to go down the two levels." J.A. 679-80.

The resulting offense level of 34 yielded a Guidelines range of 151 to 188 months' imprisonment. The district court then sentenced Garcia-Lagunas to 188 months' imprisonment while stating it was "impos[ing] a sentence at the low end of the range because this constitutes the defendant's first felony conviction." J.A. 680-81, 683. The court also sentenced Garcia-Lagunas to a consecutive sentence of 24 months' imprisonment for his unlawful reentry conviction. Only after announcing the sentence did the court allow Garcia-Lagunas to allocute.

II.

Garcia-Lagunas argues that the government's improper use of an ethnic stereotype to rebut Garcia-Lagunas's defense theory that he was too poor to be a major drug dealer was constitutional error and was not harmless beyond a reasonable doubt. We will assume, as the government conceded, see Oral Argument at 20:38–20:51, United States v. Garcia-Lagunas, No. 14-4370 (Sept. 17, 2015), http://coop.ca4.uscourts.gov/OAarchive/mp3/14-4370-20150917.mp3, that the use of the stereotype was constitutional error, and proceed directly to the question of

14

whether the government has shown that the error was harmless beyond a reasonable doubt. See, e.g., United States v. Evans, 216 F.3d 80, 89-90 (D.C. Cir. 2000) (declining to decide whether error was constitutional where the error was harmless under either constitutional or nonconstitutional standard).

## A.

For all constitutional errors that do not "'defy analysis by "harmless error" standards[,]' . . . 'reviewing courts must apply [Federal Rule of Criminal Procedure] Rule 52(a)'s harmless-error analysis and must disregar[d] errors that are harmless beyond a reasonable doubt.'"[7] United States v. Lovern, 293 F.3d 695, 700 (4th Cir. 2002) (third alteration in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 309 (1991) and Neder v. United States, 527 U.S. 1, 7 (1999)). The essential question is therefore: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" Neder, 527 U.S. at 18; see also United States v. Camacho, 955 F.2d 950, 955 (4th Cir. 1992) ("The decision below should only stand if, viewing the entire record, it is clear beyond a reasonable doubt that the jury would have

_____

[7] Garcia-Lagunas does not argue that this constitutional error is in the "limited class of fundamental constitutional errors" that require automatic reversal without a harmlessness analysis. United States v. Lovern, 293 F.3d 695, 700 (4th Cir. 2002).

15

returned a guilty verdict absent the allegedly harmless error."). The burden rests on the government, the beneficiary of the error, to show harmlessness. See Chapman v. California, 386 U.S. 18, 24 (1967). We have "the power to review the record de novo in order to determine an error's harmlessness." Fulminante, 499 U.S. at 295.

Importantly, "holding the error harmless does not 'reflec[t] a denigration of the constitutional rights involved,'" Neder, 527 U.S. at 19 (alteration in original) (quoting Rose v. Clark, 478 U.S. 570, 577 (1986)), and we emphasize that "[i]njection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial," United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992); see also United States v. Runyon, 707 F.3d 475, 494 (4th Cir. 2013) ("The Supreme Court has long made clear that statements that are capable of inflaming jurors' racial or ethnic prejudices 'degrade the administration of justice.'" (quoting Battle v. United States, 209 U.S. 36, 39 (1908))).

In this case, the government's reliance on an ethnic stereotype to explain Garcia-Lagunas's living conditions was particularly inapt given its failure to show that Garcia-Lagunas was sending significant money anywhere. The record shows that since 1988, Garcia-Lagunas has spent the great majority of his time in the United States. While he does have two children

16

living in Mexico, he has two other children living in this country, and at the time of his arrest his parents lived next door to him. Nor did the government present any evidence that Garcia-Lagunas was sending proceeds to the "next step over [him] in the drug trafficking organization." J.A. 274. Thus, the government's only "evidence" that Garcia-Lagunas was remitting money was the generalization about Hispanic drug traffickers.

That said, the harmless error rule "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions" where the constitutional error had "little, if any, likelihood of having changed the result of the trial." Neder, 527 U.S. at 19 (alterations in original) (quoting Chapman, 386 U.S. at 22). The rule thus "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial." Id. at 18 (alteration in original) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)).

B.

In this case, Garcia-Lagunas was found guilty of coming "to a mutual understanding to try to accomplish the . . . plan of distributing or possessing with intent to distribute 500 grams or more of cocaine," and "knowingly bec[oming] a member of that conspiracy." J.A. 554. We are satisfied beyond a reasonable

17

doubt that—even without the government's improper use of an ethnic stereotype—a rational jury still would have arrived at that verdict.

1.

We begin first with the quantity of the drugs involved in the conspiracy. At trial, the government presented evidence that Garcia-Lagunas sold far greater amounts of cocaine than the 500 grams charged in the indictment. The testimony of Reed, Jacobs, Brewington, and Locklear attributed to Garcia-Lagunas the sale of nearly 40 kilograms—40,000 grams—of cocaine. Thus, the jury need only have credited 1.3% of that quantity to satisfy the government's burden.

The fact that Reed, Jacobs, Brewington, and Locklear were known drug dealers each testifying pursuant to a plea agreement certainly casts some doubt on their credibility. See United States v. Garcia, 752 F.3d 382, 397 (4th Cir. 2014) (noting that a witness's testimony for the government "was put into question . . . not least because his testimony was in return for sentencing considerations by the Government in a [state] prosecution in which he faced a maximum potential sentence of life in prison and . . . deportation"). But see id. ("Of course, the jury was unquestionably entitled to credit the testimony of [that government witness]."). Here, however, the testimony of three of the dealers was bolstered by phone records

18

showing an extraordinary volume of phone calls (in a compressed period of time) between them and Garcia-Lagunas.[8]  See, e.g., J.A. 338 (Jacobs testifying that he and Garcia-Lagunas exchanged "somewhere around th[e] range" of 56 calls from February 10th to 22nd, 2012); cf. United States v. Johnson, 617 F.3d 286, 298 (4th Cir. 2010) (finding error not harmless where codefendant drug dealers' testimony was inconsistent, there was otherwise "scant evidence," and defendant "called seven witnesses to testify about his legitimate source of income").

In addition, circumstantial physical evidence also pointed to Garcia-Lagunas's guilt.  See United States v. Holness, 706 F.3d 579, 598-600 (4th Cir. 2013) (finding error harmless beyond a reasonable doubt even where "the government's case was predominantly circumstantial").  Garcia-Lagunas's room had a large scale in it that the jury heard was of the type commonly used by dealers to weigh drugs in large quantities, as well as a smaller scale typically used to weigh user amounts of drugs, which had what appeared to be cocaine and crack cocaine residue on it.

---

[8] The phone records were largely irrelevant to Locklear's testimony, as the subpoenaed records covered February 9th to 23rd, 2012, and Locklear testified that he stopped purchasing from Garcia-Lagunas following his arrest in March 2011.

In the same room, officers found a bulletproof vest that Detective Collins testified was "another tool of the drug trade." J.A. 106. Hernandez told the jury that the vest and the large scale belonged to Garcia-Lagunas. Inside a storage container in Garcia-Lagunas's room was 800 grams of a white powdery substance, packed in a vacuum-sealed bag and again in a garbage bag. The substance field-tested positive for cocaine, though the readings were "light." J.A. 108. Subsequent SBI test results showed that the powder did not contain a controlled substance but Collins explained that such a result was possible even if there were cocaine present, given the techniques used in the lab, if the cocaine had had a significant amount of cutting agent added to it. The government's evidence showed that Garcia-Lagunas was "known for adding too much additive into cocaine which would produce a very small amount of cocaine." J.A. 111; see also J.A. 363 (Brewington testifying that when he tried to resell cocaine he purchased from Garcia-Lagunas, a customer complained that "[i]t wouldn't cook properly").

Other tools of the drug trade were found in the trailer's main room. Police found a .32 caliber revolver in a purple Crown Royal bag in a cabinet over the stove, which Jacobs had given to Garcia-Lagunas that day. There were several phones on

20

the kitchen table when Collins entered the trailer,[9] and Collins testified that he had seen dealers who dealt in large quantities with four to six different phones, because "it's harder for a law enforcement officer to keep track of several different phones at a time." J.A. 85. In addition, Reed testified that he had used three to four different phone numbers to reach Garcia-Lagunas. Finally, officers also found one-inch-by-one-inch plastic baggies on top of the kitchen cabinets and in a box on top of the refrigerator.

The circumstances of Garcia-Lagunas's arrest also demonstrate that he was a drug dealer. Jacobs testified that when he had previously bought cocaine from Garcia-Lagunas at the Westcott trailer, he bought between a quarter of an ounce and three-quarters of an ounce, and that on the day of the arrest, he was there to purchase three-quarters of an ounce and had given Garcia-Lagunas $600 for it. Hernandez saw Jacobs give Garcia-Lagunas "some money . . . and a gun," J.A. 298, and saw Garcia-Lagunas count the cash before pocketing it. And when the officers arrived, Garcia-Lagunas was found with $600 in cash.

---

[9] The record does not explain where the phones were when Sergeant Johnson and Detective Stein first entered the trailer, except for the phone that Garcia-Lagunas removed from his pocket.

21

With respect to the conspiracy element of the offense, "[g]iven the 'clandestine and covert' nature of conspiracies, the government can prove the existence of a conspiracy by circumstantial evidence alone." United States v. Howard, 773 F.3d 519, 525 (4th Cir. 2014) (quoting United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996) (en banc)). While "[a] mere buyer-seller relationship is insufficient to support a conspiracy conviction," evidence that such a buyer-seller relationship is continuing and includes repeated transactions "can support the finding that there was a conspiracy, especially when coupled with substantial quantities of drugs." Id. at 525-26 (quoting United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008)).

Here, the most direct evidence that Garcia-Lagunas shared a "mutual understanding" to distribute cocaine was Brewington's testimony that he discussed the amount of cocaine he could "move" with Garcia-Lagunas, so that Garcia-Lagunas "would lower the price," J.A. 361-62, which indicates that Garcia-Lagunas knew Brewington was a reseller and not buying the drugs for his own use. In addition, Reed and Locklear each testified that they were buying from Garcia-Lagunas more than twice a week and that they were reselling the drugs that they bought from Garcia-Lagunas. See Howard, 773 F.3d at 526 (noting that defendant selling to "frequent customers who often resold the drugs"

22

supported a conspiracy conviction). More circumstantially, the high quantities and frequency of transactions attributed to Garcia-Lagunas support the government's contention that he knew his buyers were redistributing the drugs.

2.

On this record, we are satisfied that the constitutional error was harmless beyond a reasonable doubt. Put another way, we conclude "that the district court's judgment, entered on the jury's guilty verdict, could not have been substantially swayed" by the improperly admitted evidence. United States v. Holness, 706 F.3d 579, 600 (4th Cir. 2013).

Garcia-Lagunas's reliance on our decision in United States v. Johnson, 617 F.3d 286 (4th Cir. 2010), to argue otherwise misses the mark. There, we held that a nonconstitutional error in admitting police testimony regarding the meaning of wiretapped phone calls was not harmless in a drug conspiracy case where "[n]o drugs were found, no financial evidence was presented and there was no surveillance that captured [defendant] engaging in illicit activity, despite the extensive investigation mounted by the local DEA," and where the erroneously admitted testimony lent "critical credibility bolstering the government's reliance on the testimony of three convicted drug dealers." Id. at 295-96.

23

We emphasized there, however, that the testifying drug dealers "often contradicted themselves," id. at 295, and the contradictions were highlighted by a DEA agent who originally testified as a government witness but was called by the defense "to testify regarding his interview with [one of the witnesses] and the inconsistencies between the information he collected in the interview and [that witness's] testimony at trial," id. at 291 n.5.

In addition, Johnson presented a much stronger defense than Garcia-Lagunas did, testifying that he had never been involved with drugs, had no criminal record, was a former Marine and State Trooper, and had legitimate sources of income. Id. at 291. He also called several witnesses to testify to those legitimate sources of income, and several witnesses who testified about his lifestyle and character, including that he had never been involved with drugs. Id. at 291-92, 298.

Finally, the erroneously admitted testimony in Johnson was central to the government's case: A government witness testified that the language Johnson and a non-testifying codefendant used in a phone call was code related to drug dealing. With the contradictory testimony of the codefendant dealers, this was essentially the entirety of the government's case against Johnson. Id. at 296 ("Had Agent Smith's testimony been excluded, the jury would have weighed the testimony of Johnson,

24

a veteran and former law enforcement officer with no criminal record, against that of a convicted drug dealer and two co-defendants with long rap sheets.").

In short, Johnson and this case are poles apart. And unlike many of the cases that have found that an evidentiary error was not harmless (Johnson included), what Garcia-Lagunas did with his earnings from the drug trade was not an element of the prosecution's case against him. Cf. Satterwhite v. Texas, 486 U.S. 249, 258-59 (1988) (finding psychiatrist's improper testimony not harmless beyond a reasonable doubt where jury had to find "future dangerousness" beyond a reasonable doubt to sentence defendant to death, he was the only psychiatrist to testify at sentencing, and he "stated unequivocally that, in his expert opinion" the defendant would "'present a continuing threat to society by continuing acts of violence'" (quoting the record)); United States v. Williams, 632 F.3d 129, 134 (4th Cir. 2011) (finding improperly admitted stipulation not harmless beyond a reasonable doubt because it "essentially established an element of the crime").

Moreover, although the government repeated the offensive stereotype in its closing argument, the improper evidence did not pervade the trial. Cf. Garcia, 752 F.3d at 398 (finding improperly admitted testimony about the meaning of defendant's phone calls not harmless where the testifying agent testified

six of the twelve days of the trial, was recalled to the stand eighteen times, and "[f]rom the beginning of the trial to the end of the trial, the calls and the meaning of the words used in those calls were the centerpiece of the [g]overnment's case"). Finally, the challenged testimony did not open the door to the admission of further damaging evidence that would otherwise not have come in. Cf. Fulminante, 499 U.S. at 300 (finding improper admission of duplicative confession not harmless beyond a reasonable doubt where it "led to the admission of other evidence prejudicial to" the defendant).

In short, whatever questions Garcia-Lagunas's living conditions may have raised, it is beyond clear to us that a rational jury would have nonetheless convicted him of the drug conspiracy offense, even had they heard nothing of Orellano's improper testimony. Accordingly, we hold that the evidentiary error was harmless beyond a reasonable doubt.[10]

---

[10] Garcia-Lagunas also complains that Detective Orellano should not have been permitted to testify to the practices of Hispanic drug traffickers because he was not testifying as an expert. Having assumed that Orellano's testimony violated Garcia-Lagunas's constitutional rights, but having found it harmless beyond a reasonable doubt, we do not address this separate objection.

Garcia-Lagunas also contends that (1) the admission of evidence regarding Garcia-Lagunas's immigration status and use of an interpreter was plain error, (2) the district court improperly allowed Collins to testify as an expert witness in spite of the government's failure to comply with expert disclosure requirements, and (3) the district court allowed improper opinion testimony from several of the government's lay witnesses.

We review these evidentiary challenges for abuse of discretion. Johnson, 617 F.3d at 292. Where Garcia-Lagunas objected at trial, we review for harmless error, leaving the judgment intact where we are able to conclude, "after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Id. (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997)).

Where Garcia-Lagunas failed to timely object, we review for plain error. United States v. Keita, 742 F.3d 184, 189 (4th Cir. 2014). To make out a plain error, "the defendant must show 'there was an error, the error was plain, and the error affected [the defendant's] substantial rights.'" Id. (alteration in original) (quoting United States v. Boykin, 669 F.3d 467, 470 (4th Cir. 2012)).

27

Garcia-Lagunas contends that the district court erred in admitting evidence regarding his immigration status and use of an interpreter at trial. Because the defense failed to timely object at trial, we review for plain error.

Evidence of a crime or wrong is not admissible to prove a defendant's bad character in order to show that he acted in accordance with that character. Fed. R. Evid. 404(b)(1). Such evidence may be admissible, however, "for another purpose, such as proving . . . identity." Id. 404(b)(2). Under Rule 404(b), we use a four-part test to assess admissibility: "(1) the prior-act evidence must be relevant to an issue other than character, such as intent; (2) it must be necessary to prove an element of the crime charged; (3) it must be reliable; and (4) . . . its probative value must not be substantially outweighed by its prejudicial nature." United States v. Lespier, 725 F.3d 437, 448 (4th Cir. 2013) (alteration in original) (quoting United States v. Queen, 132 F.3d 991, 995 (4th Cir. 1997)).

1.

The government presented evidence that Garcia-Lagunas was an alien illegally in the United States. The government argues that this was relevant to Garcia-Lagunas's identity. At trial, the officers explained that "they learned that a Mexican man going by the name 'Alex' was a significant source of cocaine in

28

Cumberland and Robeson Counties." Appellee's Br. at 42. According to the government, Garcia-Lagunas's immigration status was thereby relevant as evidence that he was "Alex." We do not agree.

Collins testified solely that "[t]he defendant was previously deported from the United States and is an alien illegally in the United States right now." J.A. 150. This testimony has almost no probative value concerning Garcia-Lagunas's Mexican nationality; it establishes only that he is not a United States citizen. We reject the notion that an individual's status as an illegal alien, without more, creates an inference of Mexican nationality. And, importantly, the government could easily have shown that Garcia-Lagunas was from Mexico without highlighting his immigration status. See Fed. R. Evid. 404(b) advisory committee's note ("The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof . . . ."). Because the probative value of Garcia-Lagunas's immigration status, especially without reference to his country of citizenship, was so low, we find that it was substantially outweighed by its prejudicial nature. It was not, therefore, permissible 404(b) evidence. See Lespier, 725 F.3d at 448.

29

Garcia-Lagunas's evidentiary challenge, however, fails on plain error review. "To be 'plain,' an error must be 'clear' or 'obvious' . . . ." United States v. Ramirez-Castillo, 748 F.3d 205, 215 (4th Cir. 2014) (quoting United States v. Olano, 507 U.S. 725, 734 (1993)). Even if the error here was plain, we "may correct the error" only if it also "affect[s] substantial rights." Olano, 507 U.S. at 732 (alteration in original) (emphasis omitted). An error affects substantial rights "in most cases" if it "affected the outcome of the district court proceedings." Ramirez-Castillo, 748 F.3d at 215 (quoting Olano, 507 U.S. at 734).

We need not address whether the improper admission of Garcia-Lagunas's immigration status was plain because we find that it did not affect the outcome of the trial. As we have discussed, the jury had before it substantial evidence of Garcia-Lagunas's participation in a conspiracy to distribute cocaine, and his immigration status was not referenced again after Collins's testimony. Thus, we find no plain error on this record.

2.

Garcia-Lagunas also challenges the government's references to his use of an interpreter at trial, arguing that they were intended to paint him as a "faker" for relying on an interpreter when he did not need one. Appellant's Br. at 36.

30

The government's witnesses told the jury that they spoke to Garcia-Lagunas in English when they dealt with him, and some of those witnesses could only speak English. To prove that Garcia-Lagunas was the man who dealt with these witnesses, the government had good reason to clarify to the jury that he could in fact speak English, in spite of the impression his use of an interpreter may have created. We therefore find that the government's references to Garcia-Lagunas's interpreter were relevant to identity, and their probative value was not substantially outweighed by any threat of prejudice. See Lespier, 725 F.3d at 448. Accordingly, we find no error.

B.

1.

Garcia-Lagunas next contends that the district court erred in allowing Detective Collins to testify as an expert witness where the government failed to comply with the expert disclosure requirements. Because the defense failed to timely object at trial, we again review for plain error.

Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government, on the defendant's request, to provide the defendant a written summary of any expert testimony that it intends to use. That summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). "Rule

31

16(a)(1)(G) 'is intended to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" United States v. Smith, 701 F.3d 1002, 1007 (4th Cir. 2012) (quoting Fed. R. Crim. P. 16(a)(1)(G) advisory committee's note to 1993 amendment).

Garcia-Lagunas points out that the government's notice that Collins would "testify about drug trafficking investigations and methods utilized by drug traffickers to operate and protect their drug business," J.A. 32, failed to state Collins's qualifications, opinions, or "the bases and reasons for his opinions." Appellant's Br. at 38.

While Garcia-Lagunas has a viable argument that the government's short and summary notice failed to meet the requirements of Rule 16(a)(1)(G), we need not decide whether the district court's admission of the testimony was plain error, as Garcia-Lagunas cannot establish that any such error affected his substantial rights.

On that score, while Garcia-Lagunas claims that Collins's testimony was "completely unexpected," id. at 39, he fails to point to any specific portion of the testimony that took him by surprise. Collins's testimony largely served to provide the jury the contextual background of how drug trafficking

32

organizations function and explain the significance of certain physical evidence. Given the limited scope of the physical evidence, Garcia-Lagunas surely anticipated the line of questioning regarding the negative SBI test results. Accordingly, Garcia-Lagunas cannot establish that more specific notice of the scope of Collins's testimony would have so changed the defense's ability to cross-examine him that the trial would have come out differently. See United States v. Jones, 739 F.3d 364, 370 (7th Cir. 2014) ("We need not consider whether the error [of admitting expert testimony without notice] could be considered plain, because [the defendant] cannot demonstrate that he would not have been convicted absent the error, or that the introduction of that testimony without complying with the expert testimony requirements resulted in a miscarriage of justice.").

2.

Garcia-Lagunas also contends that Collins's testimony explaining how the white powder might have tested positive in the field but negative in the laboratory for any controlled substance was improper lay opinion testimony, as Collins was not an expert in SBI laboratory techniques. Counsel objected at trial; therefore we review for harmless error.

After defense counsel's objection, the government elicited testimony from Collins demonstrating his familiarity with the

33

methods used by the SBI in its laboratory tests.  In particular, he testified that he knew from his training and experience that they would test only a portion of a controlled substance.  This foundation testimony adequately demonstrated Collins's competence to testify on this issue.[11]

IV.

Garcia-Lagunas next challenges his sentence.  "We review a criminal sentence for procedural and substantive reasonableness under a deferential abuse-of-discretion standard."  United States v. Washington, 743 F.3d 938, 943 (4th Cir. 2014) (citing Gall v. United States, 552 U.S. 38, 51 (2007)).  First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range."  Gall, 552 U.S. at 51.  If the sentence is procedurally sound, we then move on to "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard."  Id.  Because Garcia-Lagunas did not object to any of the alleged sentencing errors, we review

---

[11] Garcia-Lagunas also contends that the district court erred in admitting lay opinion testimony from Detectives Taylor and Stein concerning the use of small plastic baggies and vacuum-sealed bags in drug trafficking.  Because Garcia-Lagunas did not object at trial, we review for plain error.  Garcia-Lagunas cannot meet that high bar.  Given the weight of the evidence against him, we are confident that the complained-of testimony did not affect the outcome of the proceeding.

34

for plain error.  United States v. Lynn, 592 F.3d 572, 576–77 (4th Cir. 2010).

A.

Garcia-Lagunas first challenges the district court's determination that it did not commit a Collins error in failing to instruct the jury to determine the quantity of cocaine Garcia-Lagunas was responsible for within the conspiracy.

For drug offenses, 21 U.S.C. § 841(b) "sets forth a graduated penalty scheme based on the quantity of drugs attributable to the defendant."  United States v. Foster, 507 F.3d 233, 250 (4th Cir. 2007).  The statute imposes mandatory minimum and maximum penalties when a defendant is responsible for a threshold quantity of drugs.  Here, Garcia-Lagunas was convicted of a conspiracy to distribute 500 grams or more of cocaine.  Under § 841(b)(1)(B), Garcia-Lagunas was subject to a sentence of no less than five and no more than 40 years' imprisonment.

However, in United States v. Collins, we held that "an individual defendant, found guilty of conspiracy to violate § 841(a), [should not] be sentenced under § 841(b) by considering the amount of narcotics distributed by the entire conspiracy," 415 F.3d 304, 312 (4th Cir. 2005) (emphasis omitted), but rather "the jury must determine what amount of cocaine base was attributable to [each defendant]," id. at 314.

35

The district court, relying on United States v. Williams, 439 F. App'x 254 (4th Cir. 2011) (per curiam), found that it did not need to submit this question to the jury, as "there [was] no uncertainty regarding the amount of cocaine the defendant distributed and no co-conspirators for the jury to consider," and therefore "the drug quantity charged in the indictment can serve as the statutory sentencing threshold under § 841(b)." J.A. 639.

This was not plain error. Although Williams was unpublished and therefore not precedential, it suggests that even if the district court erred, such error was not plain. See Williams, 439 F. App'x at 257; see also United States v. Hughes, 401 F.3d 540, 547 (4th Cir. 2005) ("An error is plain 'where the law at the time of trial was settled and clearly contrary to the law at the time of appeal.'" (quoting Johnson v. United States, 520 U.S. 461, 468 (1997))). In addition, Garcia-Lagunas cannot show that any such error affected his substantial rights. He was sentenced under 21 U.S.C. § 841(b)(1)(B), which has a mandatory minimum of five years' imprisonment. Had he instead been sentenced under the more lenient § 841(b)(1)(C), he would have been subject to a mandatory minimum of three years' supervised release and a mandatory maximum of twenty years' imprisonment.

There is no indication that the district court was inclined, in the absence of a five-year mandatory minimum, to give Garcia-Lagunas a sentence of less than five years' imprisonment. Nor was Garcia-Lagunas's sentence above the twenty year mandatory maximum that would have applied under the more lenient subsection. Garcia-Lagunas therefore fails to establish that there was plain error or that such error affected his substantial rights.

B.

Finally, Garcia-Lagunas argues that the district court erred procedurally when it calculated his offense level as 36. We agree, and also find that the error was plain and substantially affected Garcia-Lagunas's rights.

At sentencing, the district court announced that Garcia-Lagunas's total offense level was 36 after sustaining two of his objections to the PSR's calculation. The government responded that it would not object to a downward departure of two levels to reflect upcoming amendments to the Guidelines, and the court agreed to go down those two levels. Thus, Garcia-Lagunas's total offense level should have been 34, which would have yielded a Guidelines range of 151 to 188 months' imprisonment. While the 188 month sentence the court imposed was within this range, the court specifically stated that it was "impos[ing] a sentence at the low end of the range." J.A. 683. Additionally,

37

in its "Statement of Reasons" form, the court scored Garcia-Lagunas's total offense level at 36, noting that it sustained one of Garcia-Lagunas's objections to the PSR and used the anticipated Guidelines amendment reduction, but not acknowledging that it sustained a second objection. Thus, the court's error in sentencing Garcia-Lagunas under offense level 36 instead of 34 was plain. See United States v. Ford, 88 F.3d 1350, 1356 (4th Cir. 1996) (finding plain and prejudicial error where the erroneous addition of points to the defendant's criminal history score caused the defendant "to be sentenced at a more severe guideline range").

We also find that the error significantly affected Garcia-Lagunas's substantial rights. The district court made clear that it intended to sentence Garcia-Lagunas at the low end of the range to reflect his lack of criminal history. Thus, had it consulted the correct range, there is good reason to believe the court would have sentenced Garcia-Lagunas to 151, rather than 188, months' imprisonment.

After our original opinion in this case, the Supreme Court in Molina-Martinez v. United States, 136 S. Ct. 1338, 1347 (2016), held that "in the ordinary case a defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder." In that case, as here, the district court

sentenced the defendant under an incorrect Guidelines range, but gave him the lowest sentence under that incorrect range, which also fell within the correct Guidelines range. The Court held that despite the district court's failure to explain the sentence, "the [d]istrict [c]ourt's selection of a sentence at the bottom of the range, . . . 'evinced an intention . . . to give the minimum recommended by the Guidelines.'" Id. at 1347-48 (alteration in original) (quoting Brief for the United States at 18, Molina-Martinez, 136 S. Ct. 1338 (No. 13-40324)). Here, the sentencing court made this intention explicit, and thus "there is at least a reasonable probability that the [d]istrict [c]ourt would have imposed a different sentence" had it sentenced Garcia-Lagunas under the correct Guidelines range. Id. Because "[t]hat probability is all that is needed to establish an effect on substantial rights," Garcia-Lagunas has established that effect. Id. at 1349.

And though we need not always correct plain error, Keita, 742 F.3d at 189, we do so here. Fairness dictates that Garcia-Lagunas be sentenced under the correct Guidelines range, particularly when doing so could potentially lead to a sentence reduction. See Ford, 88 F.3d at 1356 ("[S]entencing a defendant at the wrong guideline range seriously affects the fairness, integrity, and public reputation of the judicial proceedings."). "Three years of a man's life is not a trifling thing." Id.

39

V.

We affirm Garcia-Lagunas's conviction. The district court, however, plainly erred in calculating Garcia-Lagunas's Guidelines range, and the error affected his substantial rights. Accordingly, we vacate the sentence and remand for resentencing.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>

DAVIS, Senior Circuit Judge, dissenting:

On our panel rehearing, my friends in the majority assume for the sake of argument that the improper and prejudicial testimony elicited and relied upon by the Government to convict Appellant Alejandro Garcia-Lagunas amounts to constitutional error. There is no need for assumptions; this is unequivocally, and admittedly, a case of constitutional error. Moreover, the majority concludes that the Government's error, as compounded by the district court's failure to correct it, even if of a constitutional magnitude, was harmless beyond a reasonable doubt. I, however, remain compelled to conclude that the Government did not carry its burden of proving beyond a reasonable doubt that its clearly unconstitutional use of a blatant ethnic generalization did not contribute to the jury's verdict. Accordingly, I respectfully dissent from the majority's decision to refuse, once again, to order a new trial.

I.

During trial, Garcia-Lagunas's counsel sought to show that Garcia-Lagunas was, at most, a common drug abuser and not a sophisticated drug distributor who trafficked large volumes of cocaine as alleged in the indictment. To make this distinction, counsel strategically questioned Government witnesses on cross-examination about Garcia-Lagunas's meager lifestyle, a lifestyle devoid of the flamboyant trappings derived from drug proceeds

41

that one might expect to surround a high-volume narcotics distributor. For example, the cross-examinations of convicted drug dealer Ronnie Reed and Detectives Shawn Collins and Pedro Orellano tended to establish that Garcia-Lagunas lived a life of truly limited means. Reed testified that he never knew Garcia-Lagunas to have any "fancy things" such as jewelry, firearms, or vehicles. J.A. 222. Detectives Collins and Orellano testified that, on the evening of his arrest, Garcia-Lagunas was found shirtless and shoeless in the "kitchen/living room area" of a small trailer at 353 Wescott Drive in which he had recently begun renting a room for less than $350 per month. J.A. 103-04, 315. Detective Collins described the bedroom belonging to Garcia-Lagunas as in "disarray" and explained to the jury that it looked as though Garcia-Lagunas had yet to unpack since moving to the trailer, as his belongings were scattered throughout the small room in laundry baskets. J.A. 120.

Further law-enforcement testimony showed that detectives searched the 353 Wescott trailer, as well as three other trailers in and around Robeson County, North Carolina, where it was alleged that Garcia-Lagunas had previously sold cocaine, and not one of the searches uncovered evidence of profits consistent with an individual allegedly trafficking hundreds of thousands of dollars' worth of cocaine. In fact, the only items of value that the searches uncovered, a .32 caliber revolver and $600 in

42

U.S. currency, were described as having been brought to the 353 Wescott trailer the night of Garcia-Lagunas's arrest by Brian Jacobs, allegedly in exchange for three-quarters of an ounce of powder cocaine. J.A. 298, 320–21, 342. However, no powder cocaine was actually found at that trailer or any other of the trailers linked to Garcia-Lagunas.

Testimony revealed that the only substances discovered by law enforcement to lab-test positive for the presence of cocaine were two baggies containing user amounts of crack cocaine, for which Garcia-Lagunas was not charged. J.A. 117, 122, 124, 404. Counsel for Garcia-Lagunas provided an explanation for the presence of those drugs by questioning the Government witnesses about his client's personal drug use. Three different Government witnesses testified that they had observed Garcia-Lagunas use drugs, J.A. 320, 349, 355, 376, and Jacobs testified that, <u>for a number of years, Garcia-Lagunas had actually purchased small amounts of cocaine from him for Garcia-Lagunas's personal use</u>, J.A. 354. Further, several detectives explained to the jury that, on the night of his arrest, Garcia-Lagunas had white powder under his nose, which, together with his dilated pupils and erratic movements, suggested that he had ingested cocaine immediately before the arrival of the law-enforcement officers. J.A. 103–04, 248, 283.

43

To bring home the defense theory of the case, counsel emphasized during cross-examination that Garcia-Lagunas's meager lifestyle did not square with the portrait that the Government was painting of a sophisticated, large-volume drug trafficker. Counsel astutely presented the theory by offering the jury the opportunity to contrast Garcia-Lagunas's lifestyle with that of Reed, one of Garcia-Lagunas's alleged purchasers. Counsel questioned Detective Collins and Reed on cross-examination about Reed's drug-trafficking operation and the proceeds that Reed had amassed during the four years that he sold drugs prior to his 2012 arrest on federal drug trafficking charges. J.A. 153-55, 225-30. During searches of Reed's family home and stash house, officers found more than $100,000 in U.S. currency, multiple telephones, a 2008 Infiniti, a 2006 Chevy Impala, a 2004 Acura, a 2004 BMW, a 2002 Lincoln Navigator, and multiple firearms. J.A. 154-55. The officers also found contraband consistent with a large-scale drug-trafficking operation, including more than 180 grams of crack cocaine, more than three-and-a-half kilos of powder cocaine, 240 grams of marijuana, money that the Fayetteville police department had used to conduct controlled buys from Reed, a cocaine press, and a money counter. J.A. 225-29.

The upshot of all of this, contrary to the majority opinion's one-sided spin on the evidence, is that there were

44

two, competing narratives before the jury. And it was the jury's call, not the job of the members of this appellate panel, to judge the credibility of all of the evidence, weigh it accordingly, and reach a fair and impartial verdict in accordance with law.

Ultimately, counsel for Garcia-Lagunas hoped the testimony he elicited would prompt the following question from at least one juror (because of course, he only needed to garner the interest of one juror to raise a possibility of a more beneficial outcome than the one he got): how can a man who is allegedly responsible for selling hundreds of thousands of dollars' worth of cocaine[1] not have on hand any discernable direct or indirect proceeds of any kind on the day of his arrest, with zero indication from any source that his arrest was imminent? Any experienced (and even an inexperienced) Assistant United States Attorney prosecuting cases in this Circuit would fully expect (and be prepared for) this kind of defense tack on this record.

---

[1] According to the testimony of the four drug dealers testifying pursuant to plea agreements, Garcia-Lagunas sold to them, in the aggregate, at least 39 kilos of cocaine, with each kilo of cocaine valuing approximately $30,000 to $32,000 during the relevant time frame. J.A. 205, 208, 239, 340-42, 360-61, 388.

My friends in the majority may not think much of defense theories in general, or of Garcia-Lagunas's theory in particular, but that is what it was, fully supported by admissible evidence, and well within the realm of plausible disputation by a lawyer committed to her Fifth- and Sixth-Amendment-based obligations to her client.[2] As in any prosecution, whether for a crime involving the infliction of unspeakable violence upon actual victims, or in the prosecution of the most plain-vanilla so-called "white collar" offense, and any prosecution in between, the defendant in our system is entitled to have the jury grapple, if it must, with his defense theory, unaided by blatantly foul blows delivered by the prosecution, abetted by the trial judge, in the use of racial or ethnic entreaties aimed at undermining or dismissing outright

---

[2] Recall that the indictment in this case charged a greater-included offense of conspiring to distribute or possess with the intent to distribute <u>500 grams or more of cocaine</u>, in violation of 21 U.S.C. §§ 841(a), 846. Importantly, therefore, the defense theory in this case not only militated in favor of an acquittal, but perhaps even more important from the defense perspective, it laid the basis for the jury's consideration of a lesser included offense involving a lesser amount of narcotics and thus a lower potential sentence. <u>Cf.</u> <u>United States v. Hickman</u>, 626 F.3d 756, 763-71 (4th Cir. 2010) (holding that evidence was insufficient to support the jury's guilty verdict on the indicted conspiracy involving greater drug amount but remanding for resentencing on conspiracy involving lesser drug amount).

the defense theory of the case.  But that is precisely what happened here.

As Garcia-Lagunas's defense theory became apparent during trial, the Government seemingly recognized for the first time the absence of drug trafficking proceeds as a potential weakness in its case, a case in which it now argues the evidence of guilt was always overwhelming.  The Government opted not to cure the ostensible weakness through the introduction of admissible evidence by, for example, moving to admit proof of wire transfers from Garcia-Lagunas to individuals in Mexico.  Either because such evidence did not exist[3] or because the Government failed to adequately prepare its case, the Government instead sought to counter the defense theory by eliciting an outrageous ethnic stereotype about the propensity of "Hispanic drug traffickers" to live modestly while sending "the majority if not all the proceeds back to their native countries."  J.A. 270. The Government then highlighted this irrelevant and unsupported racial generalization at the outset of its rebuttal closing argument, stating:

_____

[3] As my colleagues in the majority point out, Garcia-Lagunas has resided in the United States since he was a teenager, and the majority of his family, including his parents, spouse, and two of his children, also live in the United States, making it improbable that he was sending large amounts of money back to individuals in Mexico.

47

Ladies and Gentlemen, what did Detective Orellano tell you about Hispanic drug trafficking organizations [sic] and about what they do with their money? He told you that they package that money and they send it back to their home country as part of the drug trafficking organization. That's why we don't have an extravagant lifestyle associated with this Defendant, fancy cars, any of the things like Ronnie Reed has talked about.

J.A. 520.

The relative ability of this particular stereotype to sway one or more jurors is evidenced by its extraordinary confirming effect on the presiding judge. In response to a renewed objection to Detective Orellano's testimony, the trial judge held a bench conference and admitted that he "wasn't quite sure the relevance of" the Detective's testimony regarding Hispanic drug traffickers, but that, "based on [his] experience, . . . most Latins [sic] send money home whether they're drug dealers or not."[4] J.A. 273. The Government admittedly hoped the jurors

---

[4] The majority chooses not to address how the trial judge's statements could have independently affected the jury's thinking because they were voiced during a bench conference and there is no affirmative evidence that the jury heard the trial judge's reinforcing remarks. However, it is not Garcia-Lagunas's burden to demonstrate the rippling effects of the Government's unconstitutional testimony. Rather, the Government is tasked with establishing that its constitutional error did not contribute to the jury's verdict. Here, the Government has not attempted to show that the trial judge's statements did not affect the jury's consideration of Garcia-Lagunas's defense theory. Moreover, I note that, having both served as a juror on three occasions in criminal cases tried in Maryland state courts, and having presided for 14 years over federal jury trials employing "white noise" to keep jurors in the dark, I (Continued)

48

would draw a similar inference when rendering a verdict.  J.A. 273.

To counter Garcia-Lagunas's primary defense theory and cure a perceived hole in its case, the Government offered up a generalization about Garcia-Lagunas's ethnicity to the jury. The Government hoped that, like the presiding judge, the jurors would believe that Garcia-Lagunas's modest lifestyle could not rationally undermine allegations that he distributed hundreds of thousands of dollars' worth of cocaine because he assuredly had been sending his significant proceeds back to his native country, electing to live like a pauper in the United States.

Tellingly, even the Government concedes that the elicitation of Detective Orellano's testimony during re-direct and the recitation of the testimony at the outset of the rebuttal closing argument amounted to a constitutional error. Oral Argument at 20:38-20:51, United States v. Garcia-Lagunas, No. 14-4370 (Sept. 17, 2015), available at http://coop.ca4.uscourts.gov/OAarchive/mp3/14-4370-20150917.mps.

--------

know full well that statements made during bench conferences not infrequently remain within earshot of nearby and attentive jurors.  Accordingly, because there is nothing in the record here to suggest that the judge's remarks went unheard in this instance, it undeniably falls on this Panel, in conducting a harmless-error review, to fully consider the trial judge's statements and their potential, if not likely, impact on the jury's verdict.

During oral argument, when asked whether the error amounted to constitutional error, counsel for the Government responded unequivocally, "Yes." Id. The Panel then asked, as a result of the Government's belief that constitutional error had occurred, whether it was the Government's burden "to prove beyond a reasonable doubt that the error had no substantial effect on the jury's verdict." Id. In response, counsel for the Government firmly stated, "That's correct." Id.

Accordingly, because it is clear that "[a]ppeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial," United States v. Cabrera, 222 F.3d 590, 594 (9th Cir. 2000), I see no reason to resort to assumptions in addressing Garcia-Lagunas's appeal. See, e.g., United States v. Vue, 13 F.3d 1206, 1213 (8th Cir. 1994) (concluding that a constitutional error occurs when the Government "invite[s] the jury to put [a defendant's] racial and cultural background into the balance in determining their guilt"). The Government's appeal to an unabashed ethnic generalization was plainly a constitutional error, and as a result, it is the Government's burden to prove that its error was harmless beyond a reasonable doubt. And, for the reasons set forth below, I cannot conclude that the Government carried that burden in this case.

50

II.

As the majority explains, not all constitutional errors mandate reversal. However, when a non-structural constitutional error occurs, the reviewing court may only disregard the error so long as the Government can carry its burden of demonstrating that the error was "harmless beyond a reasonable doubt." Neder v. United States, 527 U.S. 1, 7 (1999) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). Here, the majority concludes that the Government has met its harmless-error burden because "even without the [G]overnment's improper use of an ethnic stereotype[,] a rational jury still would have arrived at that verdict." Ante at 17.[5] For several reasons, I believe this analysis grievously misses the mark.

_____

[5] As discussed fully infra, in framing the issue as it does, the majority commits a fundamental error that has been identified and warned against by distinguished legal scholars and others for decades:

> Properly applied, harmless error analysis should ask only whether the state can demonstrate that error did not sufficiently affect the outcome at trial and not, conversely, whether evidence of guilt outweighed the impact of any error. See Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) ("The inquiry . . . is . . . whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered--no matter how inescapable the findings to support that verdict might be--would violate the jury-trial guarantee."); Jason M. Solomon, Causing Constitutional Harm: How Tort Law Can Help Determine Harmless Error in Criminal Trials,

(Continued)

51

Rule 52(a) of the Federal Rules of Criminal Procedure mandates that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. Pro. 52(a). Rule 52(a)'s "emphasi[s] [on] 'substantial rights'" serves two important purposes. Chapman, 386 U.S. at 22. First, it stresses the significance of the factfinding process, recognizing that, at its heart, "the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." Neder, 527 U.S. at 18 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)). Second, it "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." Van Arsdall, 475 U.S. at 681. Accordingly, in practice, Rule 52(a) works to "save the good"—those convictions

---

99 Nw. U. L. Rev. 1053, 1085-98 (2005) (arguing that judges should look at evidence of influence on jury rather than focusing primarily on untainted evidence of guilt).

Brandon L. Garrett, Judging Innocence, 108 Colum. L. Rev.55, 108 n.195 (2008); see also John M. Greabe, The Riddle of Harmless Error Revisited, 54 Hous. L. Rev. (forthcoming 2016) (manuscript at 12 n.70) ("The [Supreme] Court has at . . . times . . . suggested that the presence of overwhelming evidence of guilt alone renders an error harmless. But these statements—which are akin to a 'correct result' test of the sort rejected in Chapman— are contradicted by the Court's more carefully reasoned cases and should not be taken to express the proper formulation." (internal citations omitted)).

that, while the product of an imperfect trial, were the subject of "constitutional errors which in the setting of [the] particular case [were] so unimportant and insignificant that they may . . . be deemed harmless"—while excising the bad—those convictions that might have been impacted by the complained of error. Chapman, 386 U.S. at 22–24.

The Supreme Court applied Rule 52(a)'s harmless-error analysis in Neder when a criminal defendant challenged a district court's failure to submit the materiality element of the defendant's tax-fraud charges to the jury. 527 U.S. at 4. The Supreme Court began by stating the overarching test for determining whether a constitutional error is harmless: "[W]hether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 15 (quoting Chapman, 386 U.S. at 24). To answer that question, the Court first considered the ways in which the Government could carry its burden of establishing the materiality element. Id. at 16. It explained that, "[i]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing the decision of the decisionmaking body to which it was addressed" but noted that "several courts have determined that any failure to report income is material." Id. (alterations in original) (citations and internal quotation marks omitted). The Court

53

then described how, at trial, the Government had "introduced evidence that Neder failed to report over $5 million in income from the loans he obtained," and that "[t]he failure to report such substantial income incontrovertibly" established the materiality element of his charges.  Id.

After emphasizing that Neder did not even attempt to contest materiality, either before the jury or on appeal, the Supreme Court concluded that, "[i]n this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent error, the erroneous instruction is properly found to be harmless."  Id. at 16-17.  And specifically applying the test set forth in Chapman, the Court further noted that, "We think it beyond cavil here that the error 'did not contribute to the verdict obtained.'"  Id. at 17 (quoting Chapman, 386 U.S. at 24).

It is true that reading portions of Neder in isolation and out of context from the remainder of the Supreme Court's extensive harmless-error jurisprudence, as the majority does in this case, could lead one to conclude that all a reviewing court must do to satisfy itself of an error's harmlessness is ask whether it is beyond a reasonable doubt that a jury would have

54

found the defendant guilty if the error had never occurred. Such an approach, however, is misplaced and ill-advised.

First, it fails to give proper credence to the narrow nature of the holding in Neder. In summarizing why its harmless-error inquiry reached "an appropriate balance between society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made," the Court took care to explain that,

> [i]n a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purpose of the jury trial guarantee.

Id. at 18–19. Unlike Neder, the present appeal clearly does not fit within the narrow subset of cases where the fact that a rational jury could have found the defendant guilty absent the erroneous omission necessarily dictates that the error did not contribute to the verdict.

Second, merely assuring oneself that a rational jury would have nonetheless convicted the criminal defendant absent the error fails to heed important guidance from the Supreme Court. The Supreme Court has explained that, in the case of affirmative error, a reviewing court should not simply confine itself to the abstract and ask "whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered."

*Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Rather, a Rule 52(a) harmless-error analysis requires us to consider "what effect [the error] had upon the guilty verdict in the case at hand" and assure ourselves that "the guilty verdict actually rendered in [the] trial was surely unattributable to the error." *Id.* This is so because, when we frame the harmless-error analysis in the abstract and remain content to imagine a world where the Government exclusively relied upon admissible evidence, we not only fail to consider the error's actual effect on the jury, but we also "improperly conflate[] sufficiency-of-the-evidence review with the appropriate *Chapman* standard." *United States v. Holness*, 706 F.3d 579, 598 (4th Cir. 2013) (quoting *Virgin Islands v. Martinez*, 620 F.3d 321, 338 (3d Cir. 2010)). Here, when I consider the specifics of the Government's prosecution of Garcia-Lagunas and the unique nature of the unconstitutional testimony and the prosecution's arguments based thereon, I am unable to conclude beyond a reasonable doubt that the complained of error did not contribute to the jury's verdict.[6]

---

[6] In this regard, it bears mention that not all constitutional infringements visited upon defendants in criminal cases stand on equal footing. That is to say, as one scholar argues, "judicial proceedings marred by unconstitutional discrimination on the basis of race, religion, ethnicity, national origin, or gender and intentional misconduct by government officials such as . . . prosecutors" deserve a
(Continued)

From opening statements through closing arguments, Garcia-Lagunas's trial lasted a mere thirteen hours spread over the course of three days. Within those thirteen hours, when confronted with a gaping hole in its confident characterization of Garcia-Lagunas as a sophisticated drug trafficker responsible for the distribution of more than 39 kilos of cocaine valued at more than $1 million, the Government knowingly and purposefully elicited inadmissible and prejudicial testimony from a law-enforcement officer. While the Government did not qualify Detective Orellano as an expert, it repeatedly requested that he testify pursuant to his "training and experience" investigating Hispanic drug trafficking organizations. J.A. 272–74. Accordingly, when Detective Orellano explained to the jury that it did not need to be concerned that the investigation into Garcia-Lagunas recovered no proceeds and instead revealed a man of abject poverty because such evidence was actually "consistent with the method of operation of Hispanic drug traffickers," he did so with an authority that any juror would have had

heightened level of scrutiny in the analysis of harmless error. Greabe, supra note 5, at 5.

57

difficulty discounting.[7]  The Government no doubt hoped that Detective Orellano's years of experience investigating "Hispanic drug traffickers" would carry weight with the jury, and the import of his testimony to the Government's case is evidenced by the Government's decision to begin its rebuttal closing remarks by asking, "What did Detective Orellano tell you about Hispanic drug trafficking organizations and about what they do with their money?"  J.A. 520.

The weighty impact of this unconstitutional testimony and argument is illuminated further when one considers that the Government's case against Garcia-Lagunas relied almost exclusively upon criminal defendants testifying pursuant to plea agreements and circumstantial evidence.  As Garcia-Lagunas pointed out to the jury, the Government was unable to present any direct evidence that Garcia-Lagunas participated in a drug trafficking conspiracy through law-enforcement testimony.  When cross-examining Detective Collins, Garcia-Lagunas confirmed that, despite a lengthy investigation into a "Mexican drug

---

[7]  Importantly, further exacerbating the impact of this improper testimony, the trial judge asked Orellano, in open court before the jury, to state the basis of his opinion.  The magic words "training and experience" were quickly forthcoming, and the trial judge promptly overruled counsel's renewed objection.  J.A. 272–73.  One can easily understand the remarkable impact on a juror who observes such a display of judicial approval of a law-enforcement witness.

trafficker named Alex," the Government did not have direct evidence of any hand-to-hand transactions or controlled buys involving Garcia-Lagunas. J.A. 152–53. This lack of direct evidence is especially probative when one considers that law-enforcement officers had Reed, Garcia-Lagunas's alleged purchaser, under "intense surveillance" while Reed was allegedly visiting Garcia-Lagunas at least three times a week to purchase cocaine. J.A. 152–53, 204–06. Despite these frequent and consistent rendezvous, law enforcement never saw Reed with Garcia-Lagunas and did not become aware of the locations of the meetings until after Reed was arrested on his own federal drug trafficking charges. Id.

Of greatest significance to this appeal's harmless-error analysis, however, is not the highly prejudicial method by which the unconstitutional evidence was presented to the jury, the Government's repeated and strategic reliance upon the evidence, or the strength vel non of the Government's case against Garcia-Lagunas. The most critical factor here is the uniquely troublesome nature of the unconstitutional testimony. Not only do "[a]ppeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial," but on a broader note, they also place the public's trust in "[t]he fairness and integrity of [our] criminal" justice system at risk. Cabrera, 222 F.3d at 594,

59

597; see also Pena-Rodriguez v. People, 350 P.3d 287, 294 (Colo. 2015) (Marquez, J., dissenting), cert. granted sub nom. Pena-Rodriguez v. Colorado, No. 15-606, 2016 WL 1278620 (U.S. Apr. 4, 2016) ("Racial discrimination in our jury trial system not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government," and "the harm caused by such discrimination is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." (internal citations and quotations marks omitted)). And it is in recognition of this fact that several of our sister circuits have unequivocally condemned the use of impermissible ethnic or racial generalizations and reversed the convictions of criminal defendants, even where the reviewing panel believed that the non-erroneous evidence was sufficient to convict. See, e.g., Cabrera, 222 F.3d at 596–97 (reversing defendants' convictions after noting that, "[a]lthough we find that the evidence was sufficient to convict Cabrera and Mulgado, Detective Brook's repeated references to their Cuban origin and his generalizations about the Cuban community prejudiced Cabrera in the eyes of the jury"); Vue, 13 F.3d at 1213 (reversing defendants' convictions despite finding that the evidence was sufficient to sustain the convictions

60

because the panel believed that "the injection of ethnicity into the trial clearly invited the jury to put the [defendants'] racial and cultural background into the balance of determining their guilt," thereby undermining the bedrock principle of our legal system--"[f]ormal equality before the law").  I agree that it is "much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case." United States v. Doe, 903 F.2d 16, 21 (D.C. Cir. 1990).

Here, because the Government repeatedly encouraged the jury to consider Garcia-Lagunas's ethnicity and draw inferences contrary to Garcia-Lagunas's interest in reliance upon an ethnic generalization, I am unable to conclude that the constitutional error did not contribute to the jury's verdict.  Specifically, the effect of the error was to eviscerate the sole plausible defense theory of the case, one with ample evidentiary support in the record.  Indeed, I am baffled how any reviewing court could consider an error of this magnitude harmless beyond a reasonable doubt, either to a criminal defendant's conviction or our criminal justice system on the whole.  By presenting to the jury its unconstitutionally constructed racial taxonomy of the universe of North Carolina drug traffickers—African-American drug dealers like Reed, who live the high life and spend lavishly and ostentatiously, with lots of cash and drugs lying about, in contrast to "Hispanic drug traffickers," whose

61

members, even long-time residents in this country, like Garcia-Lagunas, habitually choose to live in abject poverty—the Government blatantly bolstered its case in contravention of well known and well settled constitutional norms.

Moreover, as the majority opinion correctly and comprehensively explains, the jury knew, for lack of a timely objection or motion in limine by defense counsel, although it should not have been told, that Garcia-Lagunas was present in this country illegally. The majority refuses to treat that error as one remediable under our plain error doctrine. But plain error as to that singular issue to one side, the jury's knowledge of that irrelevant and highly prejudicial fact renders the prosecution's resort to racial and ethnic animus more, not less, condemnable, and should factor into the harmless-error analysis. It blinks reality not to do so.

### III.

It is ironic that, in a break from our sister circuits, and at a moment in our country's history when uncommon attention is being paid to issues of racial and ethnic stereotyping and consequent mistreatment, actual or threatened, this Court chooses to privilege the Government to employ, without consequence, irrelevant, prejudicial, and factually unwarranted evidence of blatant racial stereotyping to obtain a criminal conviction. In this moment, not even the ethnic heritage of

distinguished federal judges is beyond trashing in the public sphere, and by a prominent candidate for the most powerful office on the planet, no less. All this at a time when this Court has otherwise stood firmly against manifestations of insidious racial and ethnic animus in voting, N.C. State Conference of NAACP v. McCrory, --- F.3d ---, 2016 WL 4053033 (4th Cir. July 29, 2016), employment, Boyer–Liberto v. Fontainebleau Corp., 786 F.3d 264 (4th Cir. 2015) (en banc), and many other domains of civic, economic, and political life.

After this published opinion, future panels of this Court will be required to struggle with the issue of just how much evidence of guilt is enough evidence of guilt to permit the Court to give the Government a pass when it bolsters its pursuit of a conviction through resort to gratuitous racial and ethnic evidence intended to spur one or more jurors to convict. This case sets a very low bar, considering that the level of certainty that the constitutional violation had no effect upon any juror is agreed to be "beyond a reasonable doubt," a standard that, interestingly, this Court has long refused to allow trial judges to define for ordinary jurors. See United States v. Walton, 207 F.3d 694, 699 (4th Cir. 2000) (en banc) ("We find no reason to alter our current practice of not requiring a jury instruction defining reasonable doubt in criminal cases."). Perhaps, as we approach the 50th anniversary

63

of the seminal teachings of <u>Chapman v. California</u>, the time has come for this Court to undertake an examination of just what "beyond a reasonable doubt" means, after all.

I would vacate the conviction on the conspiracy count of the indictment and order a new trial.